

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-7-2000

# Adams v. Freedom Forge Corp

Precedential or Non-Precedential:

Docket 99-3570

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Adams v. Freedom Forge Corp" (2000). *2000 Decisions.* Paper 45.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/45

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 7, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 99-3570

DAVID L. ADAMS; AARON F. ANDREWS; PAUL A.
ARCHIBALD; LYNN E. AURAND; DOROTHY E. BAKER;
CHARLES BANSHIERE; JOHN O. BASHORE; ALBERT L.
BASOM; VAUGHN K. BAUMGARDNER; RONALD L.
BECKWITH; WILLIAM K. BELL, JR.; CHARLES E.
BENDER; JOSEPH G. BERRIER; EDWARD W. BICKEL;
CLARENCE R. BOREMAN, JR.; HARRY BRADLEY, JR.;
JOHN H. CLARK; JOSEPH R. CLOSE; JOHN A.
CLOUSER; CHARLES W. CONDO; H. RAY CONFER;
THOMAS J. CONNARE; DONALD G. COOK; RONALD W.
CRAWFORD; GLEN F. CRISSMAN; GERALD W.
CRISSWELL; CHARLES R. CRUIKSHANK; WILLIAM L.
CUMMINGS; FRANK J. DAVIDHEISER; WILLIAM A.
DAVIS; DAVID S. DOWNING; GERALD G. DUMM;
RICHARD H. EATON; PAUL E. EMMERLING; PHILIP H.
ERB; GERALD ERB; ROY J. FREED; MARVIN E. FULTZ;
CLARENCE GALVIN; RALPH A. GAUL, JR.; FRANK H.
GEISSINGER; JAMES T. GILBERT; HARVEY W. GILBERT,
JR.; ROBERT W. GILLILAND; GENE M. HAGENBERGER;
LARRY L. HARSHBARGER; JAMES L. HARSHBARGER;
CARL L. HARTSOCK; EDWIN E. HEISTER; JOSEPH E.
HELLER; DAVID S. HERST; T. LEWIS HETRICK; WILLIAM
L. HILE; DONALD HORNER; JOHN B. HOSTETLER;
MELVIN H. HUGHES; MRS. BOYD HUNTER; RONALD N.
JOHNSON; JOHN I. JOHNSON; FRANK B. KELLER; JOHN
R. KELLY; DONALD E. KNEPP; DENNIS D. KNEPP; MRS.
FRED KREBS; CHARLES W. LEEPER; GARY M. LEEPER;
EUGENE F. LINGLE; HARRIET MARTHOUSE; MRS.
CLARE MARTIN; LARRY C. MCCOY; LOIS M. MCKEE;
RICHARD D. MCMUNN; JOHN E. METZGER; CHESLEY S.
MIDDLETON; FRED MITCHELL; RICHARD L. MOORE;
HAROLD C. MUMMAH; CLARENCE B. NALE;

JOE F. NORMAN; JAMES L. NORRIS; JOSEPH M.
OLNICK; MRS. PHIL PACINI; MRS. JOHN PACINI; MELVIN
E. PARKER, JR.; HERBERT PECHT; GEORGE W. PITZER;
RICHARD J. QUILTER; JAY A. REAM; DON E. RICHARD;
FRED D. RHINEHELDER; CHARLES RIGHTER;
FERDINANDO ROSS; CALVIN E. ROTHROCK; ROBERT R.
RUNTAGH; JOHN E. SEARER; MRS. EDWARD SHANNON;
WAYNE E. SHEAFFER; RONALD J. SHOEMAKER; PAUL
SIMONETTI; DONALD W. SMITH; ROSS L. SMITH;
DONALD H. SNYDER; JAMES L. SNYDER; GLEN C.
SOLT; WILLIAM M. STEELE; JOHN W. STUCK; DAVID L.

SULOFF; ROBERT SWARTZELL; EDWARD M.
THOMPSON; S. L. TREASTER; IRVIN S. TUBBS; WILBUR
C. ULSH; RONALD I. VANADA; GILBERT H. VARNER;
GARY L. WAGNER; HARRY M. WAGNER; RICHARD S.
WAGNER; WILLIAM L. WAGNER; GENE M. WAGNER;
JAMES E. WILHELM; HENRY F. WILSON; LEE M.
WILSON; HAROLD E. WOLFGANG; ROBERT R. WRAY;
PAUL WRIGHT; DAVID W. WYCOFF; FRANK C. YOCUM,
JR.; HARRY G. NORTON; WILLIAM J. BEERS;
JOSEFA R. LINGLE

v.

FREEDOM FORGE CORPORATION, Appellant

On Appeal From the United States District Court
For the Middle District of Pennsylvania
(D.C. Civ. No. 99-cv-00446)
District Judge: Honorable Yvette Kane

Argued: November 5, 1999

Before: BECKER, Chief Judge, GREENBERG,
and CUDAHY,* Circuit Judges.

(Filed March 7, 2000)

_____

* Honorable Richard D. Cudahy, United States Circuit Judge for the
Seventh Circuit, sitting by designation.

2

LEO A. KEEVICAN, JR., ESQUIRE
CLARE M. GALLAGHER, ESQUIRE
WALTER G. BLEIL, ESQUIRE
  (ARGUED)
ALLAN W. BROWN, ESQUIRE
Doepken, Keevican & Weiss
600 Grant Street
USX Tower, 58th Floor
Pittsburgh, PA 15219

Counsel for Appellant
Freedom Forge Corporation

ALLEN C. WARSHAW, ESQUIRE
  (ARGUED)
MARY PATRICIA PATTERSON-
 LAVERY, ESQUIRE
ELLIOT D. RAFF, ESQUIRE
JENNIFER L. MURPHY, ESQUIRE

Duane, Morris & Heckscher
305 North Front Street
P.O. Box 1003, 5th Floor
Harrisburg, PA 17108-1003

Counsel for Appellees

OPINION OF THE COURT

BECKER, Chief Judge.

This ERISA appeal arises from an order of the District Court for the Middle District of Pennsylvania granting a preliminary injunction to approximately 136 former employees of Freedom Forge Corporation (and to surviving spouses of former employees), who are individually named plaintiffs in a suit seeking to require Freedom Forge to continue funding the health benefits plan currently in place for retirees and spouses. The preliminary injunction requires funding pending trial. The gravamen of the plaintiffs' claim is that Freedom Forge induced them into early retirement with oral assurances that their health insurance benefits would continue essentially unmodified until death, without informing them that it actually

3

retained the power to amend or eliminate the benefits program altogether. In doing so, the plaintiffs contend, Freedom Forge breached its duties as an ERISA fiduciary by misrepresenting and omitting material facts.

This suit was prompted by Freedom Forge's announcement that it would be switching from a self-insured benefits program with no premiums to a managed care system in which retirees would be able to choose among plans. Almost all of the choices that would provide health care comparable to that which they now receive would require the plaintiffs to pay monthly premiums. Shortly after filing suit, the plaintiffs moved for a preliminary injunction, alleging that they would be irreparably harmed if Freedom Forge changed the plans, and asserting that they were reasonably likely to succeed on the merits. After a hearing, the District Court granted the requested preliminary injunction.

This appeal primarily presents the important question whether a district court, faced with a large group of plaintiffs whom the court determines are reasonably likely to succeed on the merits, may grant a preliminary injunction to the entire group of plaintiffs if there is evidence that some, but not all, of the plaintiffs will suffer irreparable harm. At the preliminary injunction hearing,

only eleven of the approximately 136 plaintiffs testified, while none of the other plaintiffs presented evidence that they were threatened with irreparable harm or were similarly situated to those who testified. We conclude that the demanding requirements for a preliminary injunction do not yield to numbers. The vast majority of the plaintiffs did not present sufficient evidence upon which the court could find that they faced irreparable harm. Accordingly, we will vacate the preliminary injunction as to all but three of the plaintiffs for failure to meet the essential irreparable harm requirement of a preliminary injunction.

Because we find that three of the plaintiffs have adequately established that they are threatened with irreparable harm, we also consider, and affirm (as to two of them), the District Court's determination that they were reasonably likely to succeed on the merits. Their claim appears to fall squarely within the framework established

4

by In re Unisys Corp. Retiree Med. Benefits"ERISA" Litigation, 57 F.3d 1255 (3d Cir. 1995), which held that it is a breach of fiduciary duty for an employer to knowingly make material misleading statements about the stability of a benefits plan.

I. Facts and Procedural History

A. The Parties and the Proposed Change in the Plan

The plaintiffs are retired employees, and surviving spouses of employees, of the Burnham, Pennsylvania facility of Freedom Forge Corporation's Standard Steel Division. Since 1975, Freedom Forge has provided health benefits to retirees and their spouses through a self-insured plan--the Freedom Forge Corporation Welfare Benefit Plan for Salaried Employees and Retirees of the Standard Steel Division (the "Plan"). The Plan, administered by Metropolitan Life Insurance Company until 1988, is now administered by a third-party administrator, Blue Cross and Blue Shield. It is a self-insured plan, as Freedom Forge pays for the cost of retiree health coverage, and pays the administrator to process claims. Although the Plan beneficiaries are responsible for paying a yearly deductible and copayments if necessary, they do not have to pay premiums.

Early in 1999, Freedom Forge announced that it intended to switch from the Plan to a system of coverage through managed care programs. Under the proposal, retirees under age 65 would be switched to Keystone Health Plan Central coverage, and would be required to pay a portion of their

premiums, ranging from $30 to $90. Those older than 65 would be able to choose between two different plans: (1) a plan with no premium payments required, but a $10 co-payment per prescription and limited annual benefits of drug prescriptions ($1250); and (2) a plan with $20 to $40 monthly premiums, $10 to $20 co-payment per 30-day supply of prescription drugs, and drug benefits limited to $2500 a year. The retirees immediately protested. Approximately 130 retirees and spouses thereupon joined in this ERISA-based suit. They allege that Freedom Forge

owed them a duty, as their fiduciary, not to mislead them about their benefits under the Plan; that Freedom Forge breached that duty by misleading them into thinking they would never have to pay premiums; and that this breach harmed them by inducing them to retire early and otherwise rely on the assurances.

The plaintiffs moved for a preliminary injunction to require Freedom Forge to maintain the preexisting plan pending suit.1 At the hearing, two Freedom Forge administrators (Robert Robinson, Manager of Compensation and Benefits since 1979, and Thomas McGuigan, Vice President of Human Resources and Administration) testified, and the plaintiffs introduced deposition testimony of Gerald Sieber, who had been in charge of pension administration at the Burnham facility from 1978 to 1993. Eleven of the plaintiffs also testified. Plaintiffs' counsel explained: "We're not going to call 130 witnesses. We are going to, because of the time limitations, call what we believe is a representative sample of the plaintiffs." However, he adduced no evidence that the eleven witnesses were representative of the other retirees and surviving spouses.

The evidence presented at the preliminary injunction hearing established that in 1982 and 1991, Freedom Forge developed "voluntary job elimination programs" ("VJEPs") to encourage voluntary retirement.2 The controversy centers around the terms and tenor of the formal and informal communications made to potential retirees about these programs.

_____

1. The plaintiffs also moved for class certification, and the court requested briefing on the issue. The defendants objected. As of the date of the appeal, no class certification determination had been made.

2. There is some dispute about the motive for instituting the VJEPs. Freedom Forge claims that the VJEPs were attempts to help potential retirees because they allowed them to retire with benefits, instead of

firing them outright, which Freedom Forge retained the right to do. The plaintiffs contend that Freedom Forge intended to eliminate the older workers and could not otherwise do so without incurring potential liability for age discrimination. The motive, whatever it may have been, does not affect our analysis of the parties' rights and duties.

B. The Representations to the Plaintiffs

1. Oral Communications

To introduce the VJEPS, Freedom Forge held meetings describing the programs and their benefits. Gerald Sieber testified via deposition that it was his job to meet with prospective retirees and brief them on the retirement benefits to which they were entitled. Sieber, along with other members of the benefits administration team, also met informally with potential retirees and answered their questions. Sieber testified that he knew that health insurance was very important to people considering retirement, that it was "always discussed" and that "I would get a lot of questions on it. I think it was a very major factor, especially if one was approaching early retirement, it was a major factor in determining whether they were going to take early retirement or not."

Sieber testified that he told employees that they (and their surviving spouses) would be insured for their lifetimes. He acknowledged that he told people that the benefits would be free of monthly charge. Although he later testified that he did not use those words ("free of any monthly charge"), he explained:

> I would normally say, your program of health insurance benefits continues as it is, with the exception of dental coverage . . . and the fact that the retiree program contained some different allowances for certain parts of the program . . . I think all the retirees knew that--potential retirees knew that since they did not pay any monthly insurance premiums as active employees, they were not expected to pay any premiums as retirees.

Sieber acknowledged that he never told employees that their plans would or could change. He provided potential retirees with booklets, including those listed infra, which he called summary plan descriptions ("SPDs") (this is an ERISA term of art, referring to the document required by ERISA to inform beneficiaries about their rights under a plan, see 29 U.S.C. S 1022). These booklets outlined the structure of the retirement benefits plans and included no

explicit reservation of rights. Sieber testified that he thought that the summary plan descriptions for salaried employees did not apply to retirees.

Robert Robinson testified that he believed that the company always had the right to change or terminate the programs in which the retirees were enrolled, but that he never told any retirees or potential retirees of that right during the relevant time period. He stated that he did not inform them of the termination right because the intention was to provide coverage for the rest of the beneficiaries' lives.

The testifying retirees gave slightly different accounts of the content of Sieber's (and others') assurances, but they uniformly claimed that they were left with the impression that they would have lifelong insurance at the company's expense. For example, Stanley Treaster testified that he and his wife were told by Sieber that they would get full health benefits from the company until he turned 65, and that the company would then pay for a supplement so that, along with medicare benefits, they would be fully covered. Treaster represented that he was never told that he would have to pay premiums. Many of the plaintiffs testified that they relied on these assurances in making their decision to retire. For example, Albert Basom related that he took early retirement in 1982 after a "man-to-man meeting with Jerry Sieber in his office." He testified that Sieber told him that he would have no-cost health coverage for life, for himself and his wife. He also said that he "definitely" was influenced by the promised health benefits, and that he would not have been able to retire without them.

2. Written Communications

As part of the VJEP project, Freedom Forge sent out letters in 1982 announcing the plans that stated that early retirees would have

> continuation of full Hospitalization, Surgical and Major Medical coverage under the `Program of Hospital and Physicians' Services and Major Medical Expense Benefits' for retirees to age 65. Thereafter, you and

> your spouse are covered by the `Program of Hospital and Medical Benefits Supplementing Medicare.'

There was no explicit reference, in either this letter or the

programs referenced therein, to the fact that the company retained the right to amend or cancel the programs. The company sent out similar letters in 1991.3

Freedom Forge also issued two distinct kinds of documents detailing plan benefits. First, in 1981, 1986, and 1993, it distributed a booklet, which conformed with the ERISA SPD requirements, entitled "Program of Insurance Benefits for Eligible Salaried Employees" to all employees and retirees.4 Each booklet included a clear disclaimer informing all beneficiaries that Freedom Forge retained the right to amend or eliminate the Plan without the consent of the beneficiaries.5 These booklets each include a section discussing the medical coverage for "Pensioners, Employees Receiving Long Term Disability Benefits and Surviving Spouses" stating that pensioners (and the other named individuals) would be enrolled in the "Company Paid Program" or the "Program Supplementing Medicare." Additionally, Freedom Forge issued booklets describing health benefit programs for retirees and their spouses with titles that, according to the retirees, suggested

_____

3. These letters promised continued coverage under the "Program of Health Care" and the "Program of Hospital and Medical Benefits Supplementing Medicare." It is unclear to what these programs refer, but at all events there was no indication in this letter that Freedom Forge retained the right to amend or cancel the benefit plans.

4. There was no evidence that any of the plaintiffs either had or had not read them.

5. This reservation accords with the actual terms of the Plan. According to Article 7 of the Plan, Freedom Forge

> reserves the right at any time and from time to time. . . to amend, suspend, or terminate the Plan or any Component Plan for any reason, in whole or in part, and to adopt any amendment or modification thereto, all without the consent of any Employee or other person. However, the Company shall not have the right to amend or terminate this Plan or any Component Plan or any Benefit with respect to Benefit claims already incurred at the time of amendment, suspension, or termination.

they were self-contained programs, and specifically intended for pensioners.6 Unlike the other booklets, these did not include explicit language reserving the company's right to unilaterally amend or eliminate the benefits.7

The plaintiffs assert that they believed that they were not "salaried employees" and therefore not controlled by the

1981, 1986, and 1993 booklets. Each booklet was self-titled a "Program of Insurance Benefits for Eligible Salaried Employees" (emphasis added). Instead, they relied solely on statements of company representatives, the letters describing the VJEPS, and those booklets directed at retirees for information about their benefit programs. Since none of the pensioner-directed booklets prior to 1994 stated that Freedom Forge retained the right to amend the Plan, and the plaintiffs claim to have been orally assured that they would be covered in the same way for life, they represent that they thought that the company could not unilaterally change or amend their benefits. Plaintiff Ross Smith, for example, testified that he understood that the special booklets about benefits for pensioners replaced those for active salaried employees. When asked whether there was a distinction conveyed to him between active and pensioned employee benefit programs, he answered,"Oh yes. There always was. That's why there are separate booklets for the different categories of pensioners." He remembered that the benefits administrators "specifically went over these things [the benefits] because they were kind of unbelievable to us, that they would make this offer."

_____

6. These booklets included the: "Program of . . . Benefits, Salaried Pensioners & Surviving Spouses Eligible for Medicare" (1988); "Program of . . . Benefits, Pensioners and Surviving Spouses--Retired Prior to December 31, 1986, Not Eligible for Medicare" (1988); and the "Comprehensive Major Medical Plan, Standard Steel Pensioners and Surviving Spouses--Retired After December 31, 1986" (1988).

7. Two 1988 programs for "Salaried Pensioners & Surviving Spouses" do include provisions about continuation after termination with the caveat, "[t]his continuation provision does not apply if Standard Steel – Division of Titanium Metals Corporation of America replaces this Program with another program. In this event, all benefits will cease on the date this Program is terminated." There is no description of how, or under what circumstances, a "replacement" or "termination" would take place.

10

In 1994, Freedom Forge published booklets that were clearly applicable to retirees that contained the reservation of rights language. However, all of the testifying plaintiffs (except Snyder) had retired by that time.

C. Testimony Concerning Irreparable Harm

Some of the eleven plaintiffs at the preliminary injunction hearing also testified about ways in which they would be irreparably harmed absent an injunction. Albert Basom

testified that he takes medication for Paget's disease, a

bone disease affecting his right leg. He stated that he currently pays $5 every three months for prescription drugs that would otherwise cost $1072. Basom testified that if he chose the no-premium option, he would have to pay more than $1000 dollars extra every three months. He testified that he would be unable to afford the medication under the circumstances and would have to stop taking it. The resulting brittleness in his bones could lead to a broken leg, confining him to a wheelchair.[8]

Stanley Treaster testified that he retired early in 1991 as part of an incentive package. He said the proposed plan "would really kill me, really, that way, because I couldn't afford it . . . I'm on nine medications, three inhalers, and insulin." He stated that he is on an $804 per month pension, and currently pays $5 for three months' medication; the new program, he testified, would destroy his budget and make it impossible for him to take medication, including the insulin he takes twice a day.

Donald Snyder testified that he receives a $1098 per month pension. He has had five back operations, electrodes in his spine, blood pressure problems, stomach problems, and needs extensive medication. He estimated that if the new plan were put in place, his medication costs would

_____

8. If he took another option, he would have to pay less in prescription costs (probably around $1500), but an additional $20 premium every month, resulting in a total of about $1740 a year, as opposed to $20 a year. Although the mathematical estimates appear inaccurate, the District Court apparently credited the underlying claim that his prescription would cost $1072 every three months.

skyrocket from $5 every three months to $400 a month after the first quarter, i.e., for nine months out of the year.

Of the other eight plaintiffs at the preliminary injunction hearing, a few testified that they were concerned about having to switch some or all of their doctors under the new plan. Joe Norman testified that he was very concerned about the cost effects of the new program, as well as the prospect of switching from an ophthalmologist who had treated him since the 1970s. Ronald Beckwith testified that his wife would have to switch her gynecologist, urologist, and orthopedist. He predicted the cost difference would be significant for him, and stated that he was on afixed income. Charles Cruikshank, who has a heart condition, testified that the new program would affect him because it would require him to switch his primary care physician and his cardiologist and to drive farther for his bi-annual

checkup.

Others testified primarily about the financial burden. Robert Swartzell testified that he and his wife would have to pay significantly more for prescription drugs. Marjorie Krebs testified that she was concerned about the effect of the higher costs, especially for medication, and that she was concerned because there was a history of breast cancer in her family. Ross Smith testified that "my wife and I have been very fortunate physically, but none of us know what tomorrow will bring." He testified that he was on a fixed income, and he was worried that the premiums might increase, but he did not testify that he would be unable to pay them. David Suloff said that he was worried about rising premiums and changing Medicare and Social Security policies in the future. He noted that he was not on a fixed income at the time, but he was sure he would be in the future. Joseph Heller testified about the assurances given him, but adverted to no threatened harm.

A preliminary injunction was entered for the plaintiffs, collectively, on June 30, 1999. Freedom Forge timely appealed. We have appellate jurisdiction under 28 U.S.C. S 1292(a)(1).

II. Irreparable Harm

In order to obtain a preliminary injunction, plaintiffs must show both (1) that they are likely to experience

irreparable harm without an injunction and (2) that they are reasonably likely to succeed on the merits. A court may not grant this kind of injunctive relief without satisfying these requirements, regardless of what the equities seem to require. See AT&T v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1427 (3d Cir. 1994); Acierno v. New Castle Cty., 40 F.3d 645, 653 (3d Cir. 1994); In re Arthur Treacher's Franchisee Litig., 689 F.2d 1137, 1143 (3d Cir. 1982). If relevant, the court should also examine the likelihood of irreparable harm to the nonmoving party and whether the injunction serves the public interest. See AT&T v. Winback, 42 F.3d at 1427. A preliminary injunction is reviewed for abuse of discretion. Questions of law are reviewed de novo, while questions of fact are reviewed for clear error. Frank Russell Co. v. Wellington Mgmt. Co., 154 F.3d 97, 101 (3d Cir. 1998).

A. General Standards

The irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will

experience harm that cannot adequately be compensated after the fact by monetary damages. See Frank's GMC Truck Center, Inc. v. General Motors Corp., 847 F.2d 100, 102-03 (3d Cir. 1988). This is not an easy burden. See, e.g., Morton v. Beyer, 822 F.2d 364, 371-72 (3d Cir. 1987). In Morton, the plaintiff was suing for unlawful discharge, and claimed that he would be irreparably harmed unless he were to be employed pending suit, because his wages were his sole source of income. We acknowledged that Morton was likely to succeed on the merits. However, notwithstanding the plaintive (and understandable) problems that Morton faced,[9]

_____

9. Morton explained the problems of going without a wage:

> Well, I have myself, I have two sons, my older son is in, goes down to the University of Virginia. I have car payment, mortgage, insurance, you know, everything that most people have, in the course of a day. I have charges at Bamberger's and Penney's, different stores.
>
> I have a loan, two loans, I have one at the Capitol Bank, one with the Chase Manhattan for my son. I guess in the everyday, you know, the everyday expenses that everybody has, food, utilities.

822 F.2d at 371-72.

13

we reversed the district court's injunction order because "[a]lthough we are not insensitive to thefinancial distress suffered by employees whose wages have been terminated, we do not believe that loss of income alone constitutes irreparable harm." Id. at 372. The nature of the remedy was "purely economic in nature and thus compensable in money." Id. Recognizing that the request for money alone itself does not foreclose a claim of irreparable injury, see id., we concluded that there must be something uniquely threatening about the particular loss of money. In Morton, we were guided by the Supreme Court's explanation that

> an insufficiency of savings or difficulties in immediately obtaining other employment--external factors common to most discharged employees and not attributable to any unusual actions relating to the discharge itself-- will not support a finding of irreparable injury, however severely they may affect a particular individual.

Sampson v. Murray, 415 U.S. 61, 92 n.68 (1974) (emphasis added).

B. The District Court's Approach

The District Court was satisfied that the plaintiffs had connected the monetary harm to a specific harm that could not be remedied after the fact. It noted that "several" of the plaintiffs

> testified that their incomes were so limited that the higher copayments and premiums of the proposed plans would require them to forego essential medical care. This testimony established immediate and irreparable harm. . . . Plaintiffs––many of whom live on fixed incomes and would face a Hobson's choice between paying for basic necessities or needed, costly medications––have established that they would suffer like harm if the proposed modifications were to take effect.

We agree that if all the plaintiffs had presented evidence that they would have to forego medical care because of the heightened costs of the new health plan, each would have established irreparable harm. The difficulty with the

14

District Court's conclusion, however, is that only a small percentage of the plaintiffs testified, and that even among those who did, many did not present any evidence (or even make an assertion) that they would have to forego medical care or other necessities if the proposed change were to take effect. There was thus no basis for inference-drawing. Instead of making a case-by-case determination that each plaintiff demonstrated irreparable harm, or pointing to evidence that strongly indicated that all similarly situated Freedom Forge retirees necessarily risk some form of irreparable harm, the court dealt with the plaintiffs as a unit and concluded that because several of them probably risked irreparable harm, that was sufficient to satisfy that prong of the preliminary injunction test.[10]

In making this determination, and in the absence of clear Third Circuit precedent, the District Court understandably relied on several retiree health insurance cases from other courts that have required little or no showing of particularized risk of irreparable harm. For example, it cited the Court of Appeals for the First Circuit which had"no difficulty" finding that a preliminary injunction was appropriate in a case similar to this one, in which retirees disputed their former employer's power to cease paying their insurance premiums. United Steelworkers of America, AFL–CIO v. Textron, Inc., 836 F.2d 6, 8 (1st Cir. 1987). That court took note of the "generally believed facts" that:

> (1) most retired union members are not rich, (2) most live on fixed incomes, (3) many will get sick and need

10. In a supplemental letter to this court, the plaintiffs objected that "Freedom Forge . . . did not raise in the court below the issues of whether plaintiffs should be required to produce individualized proof of irreparable harm. Nor did it raise the related question of the extent to which the testimony given could be generalized to all of the plaintiffs." See also United States v. Anthony Dell'Aquilla, Enters. and Subsidiaries, 150 F.3d 329, 335 (3d Cir. 1998) ("[A]bsent exceptional circumstances, an issue not raised in district court will not be heard on appeal."). We reach the issue, however, because the burden is clearly on the moving party to prove all elements required for a preliminary injunction, see Acierno v. New Castle Cty., 40 F.3d 645, 653 (3d Cir. 1994), and because it is important to clarify the authorities, which may be in disarray, on this significant aspect of preliminary injunctions.

15

medical care, (4) medical care is expensive, (5) medical insurance is, therefore, a necessity, and (6) some retired workers may find it difficult to obtain medical insurance on their own while others can pay for it only out of money that they need for other necessities of life.

Id. The court eschewed invocation of the doctrine of judicial notice, which could not by its terms apply, see Fed. R. Evid. 201, and grounded its injunction-affirming holding in a single conclusory affidavit of an AFL-CIO president and "[c]ommon sense," which "suggests that generally believed facts (or something like them) are true." Id.

Other courts have achieved essentially the same result by allowing the judge to treat plaintiffs--and the risks attending them--in an aggregate way, and to rely on generally believed facts not in evidence. In Shalk v. Teledyne, Inc., 751 F.Supp. 1261 (W.D. Mich. 1990), aff 'd, 948 F.2d 1290 (6th Cir. 1991), for example, the court granted a preliminary injunction requiring the company to pay insurance premiums pending suit in part because "the uncertainty posed by the lack of knowing just how much money will be needed to cover medical expenses . . . poses irreparable harm in the financial planning burden which it places on plaintiffs," id. at 1268, and "[i]t is self-evident, to the Court at least, that a cost shift to retirees of what defendants themselves claim will be approximately $90,000 per month [total], constitutes irreparable harm," id. at 1267. This reasoning is congruent with Textron , supra, and that of several other courts, as described in the margin.11

11. See, e.g., Golden v. Kelsey Hayes Co., 845 F.Supp. 410 (E.D. Mich. 1994) (granting preliminary injunction requiring defendant to continue previous insurance plan and citing Textron approvingly where numerous

retirees, though not retirees from every affected division of a company, presented the court with affidavits detailing the hardship they would undergo without a preliminary injunction), aff 'd, 73 F.3d 648 (6th Cir. 1996); Mowbray v. Kozlowski, 725 F.Supp. 888 (W.D. Va. 1989) ("The class includes approximately some 9,000 members. If a stay is granted, some number of these will be faced with the difficult decision of either forgoing needed medical attention, forgoing other expenditures, or disposing of enough of their property to come within the guidelines as to assistance, which guidelines are the very substance of this action. Failure to obtain needed medical care could result in the death of some

16

While these cases have a certain intuitive appeal, they do not withstand rigorous scrutiny. The law does not take judicial notice of matters of "common sense," and common sense is no substitute for evidence. A preliminary injunction may not be based on facts not presented at a hearing, or not presented through affidavits, deposition testimony, or other documents, about the particular situations of the moving parties. The elasticity that the opposite conclusion would permit would essentially shift the burden to the defendant to disprove widely believed facts and would turn the preliminary injunction balancing process on its head.

In lieu of (or in addition to) "common sense," many of these cases pursue an additional approach, resting a preliminary injunction for many on the testimony of a few. This is not inappropriate so long as the plaintiffs lay an adequate foundation from which one could draw inferences that the testifying plaintiffs are similarly situated––in terms of irreparable harm––to all the other plaintiffs. When a court, such as the District Court, concludes that there is clear evidence that most, but not all, individuals will be harmed, it treats each individual only as part of an aggregate; in contrast, when a court infers a risk of harm

_____

class members. Surely this is substantial, if not irreparable harm." (emphasis added); Shultz v. Teledyne, Inc., 657 F.Supp. 289, 293 (W.D. Pa. 1987) ("We have had testimony in this case indicating that retirees on fixed incomes will suffer financial hardship and in some cases will be unable to pay for individual health insurance coverage. Some individuals indicated that they would forego medical care for themselves and their families due to their inability to pay for either the insurance coverage or

the direct cost of medical care. We believe that plaintiffs in this case have established that they will suffer a risk of irreparable harm.") (emphasis added); Mamula v. Satrolloy, 578 F.Supp. 563, 577 (S.D. Ohio 1983) ("The adequacy of a monetary award to a person unable to afford health insurance coverage rests on the assumption that the person will

seek and obtain necessary medical care, will pay for the medical care
received at that time, and will simply be recompensed later by the
defendant when a judgment is rendered against it. Such an assumption
could have some validity if the costs of medical services and
hospitalization in today's society were well within the financial reach of
the average worker.").

to all individuals although only a few testify, it is reasoning
inductively. The former mode of analysis is unacceptable;
the latter is the daily work of fact-finders. In short, in the
absence of a foundation from which one could infer that all
(or virtually all) members of a group are irreparably
harmed, we do not believe that a court can enter a mass
preliminary injunction.

An important factor animating our holding is our respect
for the extraordinary nature of the preliminary injunction
power. We have repeatedly insisted that the use of judicial
power to arrange relationships prior to a full determination
on the merits is a weighty matter, and the preliminary
injunction device should not be exercised unless the
moving party shows that it specifically and personally risks
irreparable harm. See, e.g., Campbell Soup Co. v. ConAgra
Inc., 977 F.2d 86, 91 (3d Cir. 1992); Frank's GMC Truck
Center, 847 F.2d at 102-03. The Supreme Court, moreover,
has instructed that the tool of the preliminary injunction
should be reserved for "extraordinary" situations. Sampson,
415 U.S. at 88, 92. And as we have previously stated, "[t]he
dramatic and drastic power of injunctive force may be
unleashed only against conditions generating a presently
existing actual threat." Holiday Inns of America, Inc. v. B &
B Corp., 409 F.2d 614, 618 (3d Cir. 1969) (emphasis added).12

In this vein, we have also insisted that the risk of
irreparable harm must not be speculative. See, e.g., Acierno
v. New Castle Cty., 40 F.3d 645 (3d Cir. 1994). 13 For many

_____

12. See also, e.g., Wyrough & Loser, Inc. v. Pelmor Labs., Inc., 376 F.2d
543, 547 (3d Cir. 1967) ("[T]he black letter rule" is that "an injunction
is
an extraordinary remedy to be granted pendente lite only upon a
showing of the likelihood of irreparable harm before the case is resolved
on the merits."); Warner Bros. Pictures v. Gittone, 110 F.2d 292 (3d Cir.
1940) ("We have pointed out frequently that the granting of a preliminary
injunction is an exercise of a very far-reaching power, never to be
indulged in except in a case clearly demanding it.").

13. Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797 (3d
Cir.
1989) (district court abused its discretion in granting a preliminary

injunction when there was no hard evidence that could have led the court to believe that a broken contract would force one party to go out of business); Marxe v. Jackson, 833 F.2d 1121 (3d Cir. 1987) (district

18

if not most of the plaintiffs in this case, the risk of irreparable harm seems speculative given the evidence presented to the District Court. The plaintiffs rely on the common sense approach of Textron to reason that most of these retirees probably cannot afford the premiums. This speculation cannot support an injunction--especially given the evidence of the relatively low premiums in the proposed plans.

Moreover, the plaintiffs all but concede that not all of them are threatened with irreparable harm. At the hearing, for example, counsel for the plaintiffs stated that"most," not all, of the plaintiffs retired under early retirement plans. He stated that Sieber met with "most" plaintiffs to discuss "most" claim programs and that "most of these people are on fixed income." The assertions of counsel were borne out by the testimony; some, but not all, plaintiffs testified that they were on fixed incomes. A few, but not most, testified that they would be forced to forego medical care. The District Court itself used qualified language in its decision ("many" of the plaintiffs live onfixed incomes; "several" of the testifying plaintiffs stated that their incomes were limited) (emphasis added).

Based on this record, we conclude there was insufficient evidence from which the District Court could infer that all the plaintiff-retirees and their spouses (in whose favor the injunction ran) were in such financial straits that they would be forced to choose between medical care and other necessities. In order to obtain a preliminary injunction that would apply to each one of them, the plaintiffs would have

_____

court erred in finding irreparable harm when there was weakly alleged possibility that, in claim of retaliatory discharge, being kept out of the workplace threatened to discourage coworkers from testifying; such a charge could constitute irreparable harm, but more specific facts indicating the existence of such a threat needed to be presented); United States v. Com. of Pennsylvania, 533 F.2d 107 (3d Cir. 1976) (threatened effect on ability to provide medical care too attenuated to constitute irreparable harm); A.L.K. Corp. v. Columbia Pictures Indus., Inc., 440 F.2d

761 (3d Cir. 1971) (threatened loss of "theatre momentum" not sufficiently concrete to require Columbia Pictures to deliver promised film before adjudication of meaning of contract).

had to present affidavits or other evidence from which one could at least infer that each of them was so threatened. Instead, the plaintiffs only presented evidence from which a court could infer that some of them were threatened with harm. In holding that this is insufficient to support a preliminary injunction, we recognize that such orders are sought when an emergency threatens, and that the moving party may not be able to marshal extensive evidence. That does not mean, however, that proof by association in a law suit, or proof by "common sense," will suffice.[14]

The plaintiffs have identified one case in which we appear to have granted a preliminary injunction for a large group of plaintiffs without requiring evidence that the parties were similarly threatened, but we are not persuaded by the citation. In United Steelworkers of America v. Fort Pitt Steel Casting, 598 F.2d 1273 (3d Cir. 1979), we upheld a preliminary injunction that required an employer to pay insurance premiums during a strike. We stated:

> If the risk of "water pipes freezing" can constitute irreparable injury, See Celotex Corp. v. Oil Workers, 516 F.2d 242, 247 (3d Cir. 1975), then surely the possibility that a worker would be denied adequate medical care as a result of having no insurance would constitute "substantial and irreparable injury." Id. Moreover, the risk of irreparable injury was not appreciably lessened merely because the employees allegedly would remain covered for 30 days after premium payments were terminated and because the employees thereafter would have the option to convert to individual policies. There was no assurance at the time the injunction was issued that the strike would end within 30 days; thus there was a significant risk that absent an injunction, the employees would be without insurance coverage. In addition, the likelihood that all of the employees could have exercised their right to obtain individual policies was problematic, because while the employees were on strike, they were not collecting their wages.

_____

14. In situations where the proof would be redundant and waste everyone's resources, the nonmoving party could, of course, choose to stipulate to irreparable harm.

Id. at 1280.

Although we appeared to treat the plaintiffs as a collective, it seems that in that case--where the employees risked losing not only all their insurance but also their jobs --the court had sufficient evidence from which to infer that such loss constituted a risk of irreparable harm for all, or practically all, the employees. In contrast, we know the evidence upon which the District Court relied here, and we find it wanting. At all events, the Fort Pitt  panel did not confront the issue we discuss today.

We do not think that the precept that multiple plaintiffs must adduce evidence from which it might be inferred that each of them is threatened with harm will be a serious hurdle to plaintiffs. Simple affidavits should typically suffice. Moreover, in many instances, the defendant will be incapable of severing its conduct towards one plaintiff from that towards another. In an injunction forbidding a town to build a wall, for example, the wall applies equally to all who are harmed by it, and only one plaintiff need demonstrate likelihood of success and irreparable harm in order to forestall construction. Likewise, if numerous riparian landowners bring suit asking for an injunction against a company dumping toxic substances into a lake, it does not matter that only one or two plaintiffs can show irreparable harm, for the court cannot possibly divine which toxics invaded which plaintiff 's waterfront. As Heraclitus noted in ancient days, one "could not step twice into the same rivers; for other waters are ever flowing on to you." Quoted in J. Bartlett, Familiar Quotations 62:14 (Justin Kaplan ed., 16th ed. 1992). In the case at bar, in contrast, Freedom Forge's counsel stated at oral argument that the company may continue the old plan for some pensioners while shifting the others to the proposed plan.15

_____

15. It goes without saying that we lay out only a general framework, fully aware that there may be unanticipated circumstances in which a particular (direct or inferential) demonstration of harm by each plaintiff will be unworkable.

C. Switching Doctors as Irreparable Harm

Plaintiffs urge a separate basis for finding irreparable harm. They point to the testimony of several plaintiffs who stated that they would have to switch health care providers, which they view, at least potentially, as an emotionally and medically risky move. They argue that this harmflows from the alleged fiduciary breach, and that a preliminary injunction is necessary to prevent it. Although they do not aver that any company executive ever promised anyone that they would never have to switch doctors, the plaintiffs

contend that such a promise inhered in the general assurance that the overarching health plan structure would not change.

There are two problems with this argument. First, the gravamen of the complaint is that the plaintiffs were promised that their insurance would be maintained, not that they would never have to switch physicians. Their harm is therefore insufficiently related to the complaint and does not deserve the benefits of protective measures that a preliminary injunction affords. Cf. John Leubsdorf, The Standard for Preliminary Injunctions, 91 Harv. L. Rev. 525, 541 (1978) ("Not even all irreparable harm, but only irreparable harm to legal rights, should count.").

Second, the hassle of switching doctors, although emotionally draining, is not the kind of "irreparable harm" contemplated by the preliminary injunction standard. In the rapidly changing world of health care, numerous plans have switched to managed care, requiring employees and other plan beneficiaries to change doctors. We are not prepared to hold, in the absence of a highly particularized and compelling demonstration of hardship, that irreparable harm flows from such a plan change simpliciter . There are many rearrangements--not just scrimping and saving rearrangements--that individuals involved in a legal battle must endure pending the conclusion of a suit, and very few will be without some anguish. As we have stated, "injunctions will not be issued merely to allay the fears and apprehensions or to soothe the anxieties of the parties." Campbell Soup Co. v. ConAgra, Inc., 977 F.2d 86, 92 (3d Cir. 1992) (quoting Continental Group, Inc. v. Amoco Chemicals Corp., 614 F.2d 351, 359 (3d Cir. 1980)).

22

Because the plaintiffs have presented no evidence that the doctors available to them under the new plan are in any way inadequate, or that the mere transfer from one physician to another is medically risky for any individual plaintiff, we will not hold that a preliminary injunction is appropriate based on the change-of-physician argument. Moreover, if we were to recognize this argument for some plaintiffs, a fortiori this approach could not be generalized to all the plaintiffs.

D. Class Certification Issues

The plaintiffs further contend that since they have sought class certification, see supra note 1, they should be treated as a class pending the court's determination on that issue. Some courts have uncritically treated a group as a collective when a would-be class has petitioned for

certification. See, e.g., Hinckley v. Kelsey-Hayes Co., 866 F.Supp. 1034 (E.D. Mich. 1994). In Hinckley, the court found irreparable harm to the 500 plaintiffs when only one of the two named plaintiffs in the proposed class presented evidence of threatened harm, and none demonstrated that money would not be an effective compensation. See id. at 1044-45. The court based its order, in part, on the fact that it was dealing with a potential class. "[T]he court will take into consideration the irreparable harm faced by putative class members before class certification because of the nature of injunctive relief at this stage of the litigation." Id. Likewise, in Lapeer Cty. Medical Care Facility v. Michigan, 765 F.Supp. 1291, 1301 (W.D. Mich. 1991), the court treated a group of noncertified plaintiffs as a class. The court analogized the preliminary injunction order to dismissal orders and compromise negotiations, in which a court can treat a non-certified potential class as a unit. Cf. Musto v. American General Corp., 615 F.Supp. 1483, 1504-05 (M.D. Tenn. 1985), rev'd on other grounds, 861 F.2d 897 (6th Cir. 1988) (treating certified class collectively for irreparable harm determination).

We disagree. We see no reason why the pendency of a class action certification petition should alter our analysis. We have no basis on which to judge the viability of the class certification request, which we understand to be

contested. Merely petitioning for class certification cannot provide plaintiffs the right to be treated collectively. Furthermore, a class action determination focuses on similarities between the legal claims of the parties, see Fed. R. Civ. P. 23(a), while a preliminary injunction determination, by requiring a showing of irreparable harm, depends in many cases (including this one) on circumstances entirely independent of legal rights: the particular resources available to each member of the class to weather hardships pending a trial.

E. Irreparable Harm - Conclusion

In view of the foregoing discussion, it is necessary that we vacate the preliminary injunction as to all of the nontestifying plaintiffs. There is simply insufficient evidence of irreparable harm as to those plaintiffs. This conclusion does not mean, however, that we must uphold the preliminary injunction for all the testifying plaintiffs. Rather, only three of the testifying plaintiffs met the high preliminary injunction standard. Basom and Treaster effectively demonstrated that they would not be able to afford the medicine they need if the new plan is put into effect pending trial. Snyder is a close case, but we will defer

to the District Court's discretion in this matter, and its decision that he risked irreparable harm. Therefore if Basom, Treaster, and Snyder meet the "likelihood of success on the merits" requirement, we will uphold the preliminary injunction as applied to them.16 However,

_____

16. In opposition to the grant of a preliminary injunction for any plaintiff,
Freedom Forge submits that the new plans do a better job, overall, of assuring good health care to the plaintiffs. Whether or not this is true, on this record we cannot determine which is the better plan for the plaintiffs. We are also wary of accepting the company's (or the plaintiffs')
vision of which is the better overall plan at the preliminary injunction stage, especially when the parties are struggling over particular, not general, aspects. See Shalk v. Teledyne, Inc. , 751 F.Supp. 1261, 1267 (W.D. Mich. 1990) ("[D]efendants claim that the current Teledyne Plus Plan offers coverage which is `substantial and in many respects better than the prior plan. . . .' This argument is of no consequence. It is not this Court's task to decide which health plan is`better.' ") (emphasis in original).

several of the testifying plaintiffs (Swartzell, Krebs, Norman, Heller, Cruikshank) did not testify to any particular facts that would make the switching of plans cause them irreparable harm. None stated that he or she was on a fixed income, or that he or she would be unable to pay. At all events, there was insufficient evidence that any of these plaintiffs was threatened with a financial burden that would force them to eschew medical treatment or other necessities such as food or shelter. Therefore, we will vacate the preliminary injunction as applied to them.

Our most difficult decisions concern those plaintiffs who testified to serious financial burdens, but did not represent that they would have to forego medical treatment. Smith and Beckwith testified that they were on fixed incomes; Suloff said that he would be on a fixed income in the future. But given the relatively low level of the additional payments under the proposed plans, we can not conclude that the testimony of a plaintiff that he or she is on a fixed income is sufficient evidence from which a court can infer irreparable harm. As we discussed supra, there must be some specific harm identified that flows from the actual financial burden in a given case. Therefore, we must also vacate the order of the District Court as to these plaintiffs for failure to demonstrate irreparable harm.

III. Probability of Success on the Merits

The balance of this opinion applies only to those remaining three plaintiffs--Basom, Treaster, and Snyder-- who provided sufficient evidence of irreparable harm. As to them, we must determine whether the District Court abused its discretion in concluding that they were reasonably likely to succeed on the merits.

ERISA provides that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries." 29 U.S.C.S 1104(a)(1). The fiduciary may not, in the performance of these duties, "materially mislead those to whom the duties of loyalty and prudence are owed." In re Unisys Corp. Retiree Med. Benefits "ERISA" Litig., 57 F.3d 1255, 1261 (3d Cir. 1995). See also Curcio v. John Hancock Mut. Life Ins. Co. , 33 F.3d

25

226, 238 (3d Cir. 1994); Bixler v. Central Pa. Teamsters Health and Welfare Fund, 12 F.3d 1292, 1300 (3d Cir. 1994); Fischer v. Phila. Elec. Co., 994 F.2d 130 (3d Cir. 1993). A plan administrator, like Sieber and other Freedom Forge administrators, acts as a fiduciary when explaining plan benefits and business decisions about plan benefits to its employees. See Unysis, 57 F.3d at 1261 n.10.17

An employee may recover for a breach of fiduciary duty if he or she proves that an employer, acting as afiduciary, made a material misrepresentation that would confuse a reasonable beneficiary about his or benefits, and the beneficiary acted thereupon to his or her detriment. See id. at 1264. Having made such representations, a company cannot insulate itself from liability by including unequivocal statements retaining the right to terminate plans at any time in the SPDs. See id. Moreover, a fiduciary may not remain silent when he or she knows that a reasonable beneficiary could rely on the silence to his or her detriment. See Bixler, 12 F.3d at 1300 ("Th[e] duty to inform . . . entails not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful.").

The facts of this case, described supra, are so much like those in Unisys, the landmark case in this area, that we need spend but little time addressing this prong of the preliminary injunction standard. In Unisys, as here, the company announced a significant change in its benefit plan scheme, after which beneficiaries were to shoulder the responsibility of paying premiums that had previously been the exclusive responsibility of the company. The Unisys plaintiffs objected, noting that their SPD included the statement that: "Coverage continues for you for life and for your dependents while they remain eligible provided you

don't stop the contributions for their coverage." 57 F.3d at 1259 (emphasis in original). They also adduced evidence, as

_____

17. A fiduciary includes any person who "exercises any discretionary authority or discretionary control respecting management of such plan" and any person who "has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. S 1002(21)(A).

26

here, that they had been informally promised "lifetime" benefits without any reference to a reservations of rights. See id.

Unisys acknowledged the statements regarding lifetime coverage in the SPDs, but defended on the grounds that elsewhere in the SPDs it explicitly retained the right to amend or change the plans at any time. Relying on the principle that "when a plan administrator explains plan benefits to its employees, it acts in a fiduciary capacity," id. at 1261, we concluded that the conflicting statements could give rise to an action under ERISA because ERISA plan administrators have an independent fiduciary obligation "not to misinform employees through material misrepresentations and incomplete, inconsistent, or contradictory disclosures." Id. at 1264. We concluded that a misrepresentation is material if "there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed retirement decision." Id.

A. Unisys and Plaintiffs Basom and Tre aster

In this case, as in Unisys, the plaintiffs do not deny that there is an explicit reservation of the right to terminate or amend at any time within the booklets for active employees. They contend, however, that they reasonably believed that the active employees' booklets did not apply to them. In support of this contention, the plaintiffs presented evidence that Freedom Forge distributed separate booklets summarizing the benefits of pensioners and surviving spouses that included no explicit reservation of the power to amend or change the programs.18 Freedom Forge responds that the lack of reservation clauses in the booklets is immaterial because the booklets were not

_____

18. Although some of those booklets did contain a reference to the possible termination of the programs by Freedom Forge, these references did not describe a process for unilateral program termination that would alert a potential retiree to the instability of his or her benefits: "This continuation provision does not apply if Standard Steel – Division of

Titanium Metals Corporation of America replaces this Program with another program. In this event, all benefits will cease on the date this Program is terminated." See supra note 7.

actually summary plan descriptions. Although we agree that the form and title of a document may be considered when determining whether a beneficiary could reasonably rely on the statements therein, conflicting assertions cannot be ignored because they are not in the formal ERISA document. Unisys did not rely on the official nature of the SPDs to conclude that the company had breached its duty, and based its decision in part on the informal communications of Unisys management. See id. at 1261–65.

Freedom Forge further contends that the booklets directed at "Eligible Salaried Employees," which included explicit reservations of rights, applied to both those who were active employees and those who were on pensions. It notes the absence, in the "informal" booklets introduced into evidence by the plaintiffs, of ERISA-required details, such as the name of the plan administrator and the means of complaint, the lack of which makes them something less than SPDs. The question before us, however, is not what the booklets actually were, but what they would appear to be to a reasonable employee. The "informal" booklets that the plaintiffs introduced into the record are titled "Programs," suggesting a parallel status with the "formal" booklets, also entitled "Programs." Furthermore, the plaintiffs presented testimony of several retirees who stated they were told and believed that the "Salaried Employees" booklets did not apply to them. Gerald Sieber, whose responsibility it had been to explain retirement benefits, testified that he thought that the retiree booklets, and not the "Salaried Employees" booklets, defined the rights of the retirees. Finally, the plaintiffs note that the "Salaried Employees" booklets include descriptions of several benefits (such as dental) that do not apply to pensioners, suggesting that they were not relevant to retirees.

In response to these arguments, Freedom Forge acknowledges that were it to eliminate benefits altogether, that might make the misrepresentations actionable. It submits, however, that since it only intends to amend the Plan and shift the costs, there was no actual misrepresentation when its representatives promised "health benefits . . . for life." Freedom Forge also

emphasizes that health care itself has never been "free" in that beneficiaries have always had to pay copayments and deductibles. However, some of the testimony at the hearing indicated that the Freedom Forge employees' understanding of the promise of life-long health insurance was that they would never have to pay premiums. The District Court found this testimony credible, and it is supported by the record; hence, we do not disturb its conclusion. Given the substantial rearrangement of the rights and duties regarding health insurance proposed by Freedom Forge, we are convinced that there was sufficient evidence that the proposed changes, if effected, would countermand the promises of health care for life.

Finally, Freedom Forge suggests that it should not be liable because it did not anticipate that it would change the plans, so that the misleading statements were made without the requisite scienter. We encountered, and rejected, a like defense in Unisys. See 57 F.3d at 1265 n.15. There, we recognized that the company had no reason to expect, at the time it distributed the misleading SPDs, that the plans would be modified. However, because Unisys was aware that it retained the right to modify, a knowing failure to clarify the material information about the retention of power was a breach of its fiduciary duty. We indicated that in order for a company to avoid liability on the grounds that it did not expect to change or eliminate a plan, the change or elimination would have to be, at least, "completely unanticipated." Id. As in Unisys, Freedom Forge had sufficient awareness of the power to change the Plan. See id. ("[T]he company had the foresight to draft and incorporate reservation of rights clauses into its retiree medical plans, which expressly gave the company the right to terminate the plans if they became onerous.").

Based on Unisys, we conclude that the plaintiffs presented sufficient evidence of statements that would cause "a substantial likelihood" of "misleading a reasonable employee in making an adequately informed retirement decision" and hence that Basom and Treaster are

29

reasonably likely to succeed on the merits of their breach claim. See id.19

B. Unisys and Plaintiff Snyder

Unlike the other two remaining plaintiffs, the case of Donald Snyder is not controlled by Unisys because although he went on disability in 1983, he did not retire until 1999, more than four years after Freedom Forge began publishing booklets for retirees that included a

strong reservation of rights. Snyder averred that in 1983 he was told that he and his wife would be taken care of for the rest of their lives. Unlike the other plaintiffs, who retired early, he produced no evidence of detrimental reliance on these misrepresentations. He presumably went on disability involuntarily and there is no evidence that he retired early. Since the lawyers for both sides were dealing with the plaintiffs collectively, the peculiar nature of his claim was not briefed. Although we do not foreclose the possibility that Snyder could adduce facts to state a claim for breach of fiduciary duty under ERISA, the facts before the District Court after the preliminary injunction hearing do not suffice to support a conclusion that he is reasonably likely to succeed on the merits.

_____

19. Freedom Forge has asserted that, regardless of the strength of plaintiffs' Unisys argument, they are barred from pursuing any claim by ERISA's statute of limitations. This is a matter of considerable difficulty

and implicates sophisticated questions about whether the statute begins to run at the date of the misrepresentations, the date of the plan amendment, or some other date, as well as the issues left unresolved in Kurz v. Philadelphia Elec. Co., 96 F.3d 1544 (3d Cir. 1996), about the anatomy and scope of the fraudulent concealment doctrine, see id. at 1552 n.5. The District Court concluded that the claims were not likely to be barred by the statute. However, Freedom Forge's counsel conceded at oral argument that the statute of limitation defense was not before the court of appeals "as a substantive statute of limitations argument." As he noted, "[t]his court will have opportunity in the next Unisys litigation

to rule on whether or not that statute of limitations [argument] is substantively correct." Therefore, we do not reach these statute of limitations questions at this time.

30

IV. Conclusion

For the foregoing reasons, we will affirm the District Court's order as to Basom and Treaster, but will vacate the preliminary injunction as it applies to all others.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

31