UNITED STEELWORKERS OF AMERICA, AFL–CIO, Plaintiff, Appellee,

v.

TEXTRON, INC., Defendant, Appellant.

No. 87–1241.

United States Court of Appeals, First Circuit.

Argued Sept. 10, 1987.

Decided Dec. 9, 1987.

Jason Berger, P.C. with whom Ruth L. Kaplan and Peabody & Brown, Boston, Mass., were on brief, for appellant.

William T. Payne, Asst. General Counsel, Pittsburgh, Pa., with whom Bernard Kleiman, Chicago, Ill., General Counsel, Warren H. Pyle and Angoff, Goldman, Manning, Pyle, Wanger & Hiatt, Boston, Mass., were on brief, for appellee.

Before CAMPBELL, Chief Judge, GARTH,* Senior Circuit Judge, and BREYER, Circuit Judge.

BREYER, Circuit Judge.

This case arises out of a dispute over the meaning of language in several collective bargaining agreements between the Steelworkers Union and Textron. The Steelworkers Union, representing metalworkers who retired from Textron's Waterbury Farrel Division, says the language means Textron must guarantee the payment of health and life insurance premiums for the rest of those retired workers' lives; Textron disagrees. The district court issued a preliminary injunction requiring Textron to pay the premiums pending a trial on the merits. Textron now appeals from that preliminary order. 28 U.S.C. § 1292(a)(1) (1982). In our view, the order is lawful.

The contracts in question consist of a series of collective bargaining agreements between Textron and the Union dating back to 1961. Though the relevant language differs slightly among the agreements, it typically says (for example) that the Company (Textron) "shall pay" for retiree life insurance and that (specifically defined) medical benefits "shall be provided" to union members who retire. *See* Appendix.

In early 1985 Textron sold its Waterbury Farrel Division to Jones & Lamson Machine Co. (hereinafter "JL"). JL agreed to assume liability for "life insurance and medical benefits" payable under the agreement to Textron's "retired employees." The Union, however, did not agree to look to JL to fulfill Textron's obligation to pay. Instead, the Union asked Textron to guarantee JL's payment of retiree health and life insurance benefits; Textron refused, and the Union invoked a grievance procedure to obtain arbitration. (Evidently, the grievance is still pending.) To make a long story short, JL paid the insurance premiums for a while; it experienced serious business problems; it stopped paying; the Union sued Textron; and the court granted the preliminary injunction here at issue.

As is well known, a district court may grant a preliminary injunction if it finds that (1) without it the plaintiff will suffer irreparable injury, (2) the injury outweighs the harm the injunction will cause the defendant, (3) the plaintiff has shown a likelihood of success on the merits, and (4) the injunction is consistent with "the public interest." *Planned Parenthood League of Massachusetts v. Bellotti,* 641 F.2d 1006, 1009 (1981) (quoting *Women's Community Health Center v. Cohen,* 477 F.Supp. 542, 544 (D.Me.1979)). The heart of the matter is whether "the harm caused plaintiff without the injunction, *in light of* the plaintiff's likelihood of eventual success on the merits, outweighs the harm the injunction will cause defendants." *Vargas–Figueroa v. Saldana,* 826 F.2d 160, 162 (1st Cir.1987) (emphasis in original); *accord Commonwealth of Massachusetts v. Watt,* 716 F.2d 946, 953 (1st Cir.1983); *cf. Securities & Exchange Commission v. World Radio*

* Of the Third Circuit, sitting by designation.

*Mission, Inc.,* 544 F.2d 535, 541 (1st Cir. 1976) ("To the extent that a defendant can show harm, this must be discounted by the degree that a plaintiff can show likelihood of success."). The district court has broad authority to apply these criteria to the facts of a case, the appellant bearing a "heavy burden" of showing "clear error ... or abuse" of that authority. *Roselli v. Affleck,* 508 F.2d 1277, 1280 (1st Cir.1974) (citing *Engine Specialties, Inc. v. Bombardier Limited,* 454 F.2d 527, 530 (1st Cir.1972)).

 Applying these typical standards, we have no difficulty finding the district court's preliminary order lawful. Neither Textron nor JL has paid medical insurance premiums for approximately 200 retired Waterbury Division workers. Suppose we take this specific, undisputed, fact and add general facts that either are commonly believed or which courts have specifically held sufficient to show irreparable harm; such general facts as (1) most retired union members are not rich, (2) most live on fixed incomes, (3) many will get sick and need medical care, (4) medical care is expensive, (5) medical insurance is, therefore, a necessity, and (6) some retired workers may find it difficult to obtain medical insurance on their own while others can pay for it only out of money that they need for other necessities of life. *See, e.g., Zotto v. Scovill, Inc.,* Slip Op. No. 85–494 (D.Conn. Nov. 7, 1985) ("a reduction in medical benefits 'establishes the threat of irreparable harm' because 'the practical effect of the reductions could well be to preclude retirees from seeking needed medical treatment' "); *United Steelworkers of America, AFL–CIO v. Fort Pitt Steel Casting,* 598 F.2d 1273, 1280 (3d Cir.1979) ("surely the possibility that a worker would be denied adequate medical care as a result of having no insurance would constitute 'substantial and irreparable injury' "); *Whelan v. Colgan,* 602 F.2d 1060, 1062 (2d Cir.1979) ("the threatened termination of benefits such as medical coverage for workers and their families obviously raised the spectre of irreparable injury."). We should then conclude that retired workers would likely suffer emotional distress, concern about potential financial disaster, and possibly deprivation of life's necessities (in order to keep up in insurance payments). In short, taken together, these facts would show harm that, in this sort of case, is 'irreparable.' *See, e.g., UAW v. White Farm Equipment Co.,* 119 L.R.R.M. (BNA) 2878, 2882 (D.Minn.1984); *Mamula v. Satralloy, Inc.,* 578 F.Supp. 563, 577 (S.D.Ohio 1983).

The appellant argues, however, that the law does not permit the district court to take as true both the specific fact and the generally believed facts. We disagree. The specific fact is alleged in the complaint, supported by affidavit, and undisputed. Common sense suggests that generally believed facts (or something like them) are true. *E.g., Newcomb v. Brennan,* 558 F.2d 825, 829 (7th Cir.1977) (courts may take notice of facts commonly known); *cf.* J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 201[03] at 201–25 to 201–31 (1986) (suggesting that in bench trials a court should assume all facts unlikely to be challenged as well as those that are indisputable). And, plaintiffs presented an affidavit indicating the generally believed facts (or facts like them) *do* exist here, namely, an affidavit by the Local president, John Bly, which said the following:

> I am not in touch with most of the retirees, but I do know that several of those with whom I am familiar are threatened with serious financial problems because of the cancellation of their retiree insurance. For example, ... Wilbur Chepul, who retired prior to the sale, was hospitalized with a brain tumor and died in December, 1986; his widow is left with unpaid bills.

Bly's affidavit also referred to two other workers who did not retire soon enough to receive the benefit of the injunction (which applies only to workers who retired before the sale to JL), but whose plight the district court could take as illustrative of what could occur among all retirees. Bly said:

> For example, plaintiff Herbert E. Schlander, who worked 43 years at the plant and retired in June 1985 has a wife who has a serious heart condition which developed in September, 1986. He and his

wife are under age 65 and they are faced with several thousand dollars in medical bills which would otherwise be covered by insurance. Domenic Montagano, who retired in 1986 has had brain surgery and is told he is not covered by the retiree insurance so that he is being billed for hospital and physicians services. Marcel Lavigne, who retired in May, 1986[,] has had open heart surgery and the insurer is refusing to pay.

There is adequate support for the district court's finding of "irreparable harm" in respect to loss of medical benefits.

What about the loss of life insurance? Textron argues that life insurance premiums are different because a money judgment at the end of the lawsuit can adequately compensate the union members for any loss of life insurance caused by Textron's failure to pay (the rather small) premiums. At oral argument, however, Textron conceded that the life insurance in question amounts to $2,000 payments designed to provide cash for funeral, or other similar, expenses incurred at the time of a death. It seems to us that lack of ready cash for such purposes threatens the sort of serious emotional harm that (for reasons similar to those just mentioned) can support a finding of irreparable harm, at least in the face of a record that contains no contradicting or countervailing evidence or concern. We find adequate grounds for "irreparable harm" here as well.

At the same time, Textron has failed to show how the issuance of the injunction will have harmed it should it ultimately prevail. The district court, as a condition of the injunction, required the Union to post a bond of $200,000. If Textron ultimately wins, it can recover from this bond the amount of money that it told the district court it would need to make insurance premium payments. The balance of harms supports the Union.

Plaintiffs have also shown a likelihood of success on the merits. The contract language—retiree medical benefits "shall be provided" and the "Company shall pay" for retiree insurance—is consistent with a Textron promise to pay retirees' insurance costs throughout their retirement, even after the particular collective bargaining agreement expires. *See, e.g., UAW v. Yard–Man, Inc.,* 716 F.2d 1476, 1480 (6th Cir.1983), *cert. denied,* 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984) ("will provide" supports this interpretation); *Upholsterer's International Union v. American Pad & Textile Co.,* 372 F.2d 427 (same in regard to "will continue"). The Union adds that it would not make much sense for Textron to promise to pay retiree insurance costs for only the few years of the contract's actual life. *See United Steelworkers of America v. Textron,* No. 85–4590–Mc at 5 (D.Mass. Feb. 2, 1987) [Available on Westlaw, 1987 WL 33023], (order granting preliminary injunction) ("If retirement lasts at all, it lasts for a life time [sic]."); *cf. Yard–Man, Inc.,* 716 F.2d at 1482 (analogizing retiree benefits to "status" benefits, which carry "an inference that they continue so long as the prerequisite status is maintained"). The Union also introduced extrinsic evidence from a Textron benefits clerk, a Textron vice president, and a document that Textron gave to the president of JL. The clerk said that she explained benefits to potential retirees without suggesting that the benefits might terminate during their retirement; the vice president said he told JL's president he wanted JL "to be obligated to pay the retirees' medical benefits for the remainder of their lives;" and the document estimated the cost of JL's providing *lifetime* benefits to retirees.

On the other hand, Textron points to language in the bargaining agreement that limits its duration ("The terms and conditions of this Agreement shall continue in effect until midnight August 31, 1985. . . ." *See* Appendix.), and it points to factors that, in its view, undermine the significance of the Union's extrinsic evidence. Textron also says that retirees received *additional* benefits provided in *new* agreements made *after* they had retired; why then should they not also suffer the disagreeable consequence of losing benefits when future contracts did *not* renew them?

At this stage of the proceeding, we need not weigh these conflicting arguments.

We need only decide whether the district court could find a likelihood of success for the Union. In our view, the record adequately supports that finding.

As to the final relevant factor—consistency with the "public interest"—the evidence favors neither party.

Textron makes one additional point. It says that the injunction is a 'mandatory' injunction; that district courts ought not issue mandatory injunctions except in unusual cases, *e.g., Martin v. International Olympic Committee*, 740 F.2d 670, 675 (9th Cir.1984); *Doe v. New York University*, 666 F.2d 761, 773 (2nd Cir.1981); *Massachusetts Coalition of Citizens v. Civil Defense Agency*, 649 F.2d 71, 76 n. 7 (1st Cir.1981); and that the district court here failed to apply that stricter standard.

In fact, however, the relevant First Circuit authority does no more than suggest that courts disfavor injunctions that disturb, rather than preserve, the status quo. *See Massachusetts Coalition of Citizens, supra; see also Martin, supra; Doe, supra.* And this fact, in turn, suggests that we should view the injunction here not as mandatory, but as prohibitory. *See Crowley v. Local No. 82, Furniture and Piano Moving, Furniture Store Drivers, Helpers, Warehousemen, and Packers*, 679 F.2d 978 (1st Cir.1982), *rev'd on other grounds*, 467 U.S. 526, 104 S.Ct. 2557, 81 L.Ed.2d 457 (1984). The "last uncontested status which preceded the pending controversy," *Westinghouse Electric Corp. v. Free Sewing Machine Co.*, 256 F.2d 806, 808 (7th Cir.1958), *quoted in Crowley*, 679 F.2d at 995–96, was a status in which Textron paid the necessary premiums. The Union protested Textron's transfer of its payment obligation to JL; it insisted upon a Textron guarantee that premiums would be paid; and it brought an (as yet unresolved) grievance proceeding when Textron refused to provide that guarantee. The injunction thus preserves the "pre-grievance" status of retirees, of the Union, and of Textron.

Regardless, having examined the record and the district court's opinion, we believe the injury to the workers is serious enough,

the absence of harm to Textron clear enough, and the likelihood of the Union's success great enough that the district court would have issued the injunction whether it saw it as maintaining or changing the just previous status quo.

The district court did not abuse its discretion in requiring Textron to meet its insurance obligations to the pre-sale retirees. The order of the district court is

*Affirmed.*

## APPENDIX

Articles XX and XXX of the 1982–1985 Labor Agreement

### Article XX

2. PENSIONERS AND MEDICARE

A. Employees retired under the provisions of the Pension Plan who are under age sixty five (65) and eligible dependents under age sixty five (65) of any employee retired under the provisions of the Pension Plan shall be provided:

1. Inpatient care under the Connecticut Blue Cross Plan with Semi–Private Room Credit Rider;

2. The Connecticut Blue Shield Community 10 Plan; and

3. The same Major Medical Insurance Plan offered to active employees under Paragraph 1B of this Article XX.

B. Active employees eligible for Medicare, employees retired under the provisions of the Pension Agreement eligible for Medicare and spouses eligible for Medicare of active or retired employees shall receive the benefits set forth below at the cost of the Company.

1. Blue Cross coverage in effect under this Agreement on the date of their becoming eligible for Medicare shall be modified so as to supplement Medicare In–Hospital Coverage (Part A) and to provide the benefits under Blue Cross "65".

. . . .

### ARTICLE XXX

Termination

The terms and conditions of this Agreement shall continue in effect until midnight

August 31, 1985, and from year to year thereafter unless either party gives 60 days written notice prior to August 31, 1985 or August 31 in any year thereafter, of its desire to modify or terminate this Agreement. In the event of such notice from either party, during such 60–day period the parties shall meet in conference in Cheshire, Connecticut, or at such other place as may be mutually agreed upon, for the purpose of negotiating the terms and conditions of a new Agreement.

Any notice to be given under this Agreement shall be given by registered or certified mail, and if by the Company be addressed to the United Steelworkers of America, A.F.L.–C.I.O., 100 South Turnpike Rd., Wellingford, Conn. 06492, and if by the Union, to the Company at Cheshire, Connecticut. Either party may, by like written notice, change the address to which registered or certified mail notice to it shall be given.