UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2003

(Argued: June 2, 2004          Decided: July 15, 2004
                                      Errata Filed: August 9, 2004)
Docket Nos. 03-9007(L), 03-9043(CON), 03-9045(CON),
    03-9313(CON), 03-9357(CON), 04-0104-cv(CON)

_____

JAMES LAFOREST, HENRIETTA LAFRINERE, ROBERT LINTZ,
RALPH MINER, LAVERNE SPENCER, and IRENE WESOLOWSKI,
individually and as a class of persons similarly situated,

*Plaintiffs-Appellees*,

- v. -

FORMER CLEAN AIR HOLDING COMPANY, INCORPORATED,

*Cross-Defendant*,

HONEYWELL INTERNATIONAL, INC.,

*Defendant-Appellant-Cross-Appellee*,

MOTOR COMPONENTS, L.L.C., BAM ENTERPRISES, INC.,
MARK IV INDUSTRIES, INC., ARVINMERITOR, INC.,
and PUROLATOR PRODUCTS CO.,

*Third-Party-Defendants-Appellees-Cross-Appellants*.

_____

B e f o r e :

1

CALABRESI and WESLEY, *Circuit Judges*, and SCULLIN, *District Judge.*[*]

_____

Appeal from the judgment of the United States District Court for the Western District of New York (Telesca, J.), entered on September 19, 2003, granting a preliminary injunction ordering defendant-appellant Honeywell International, Inc. to comply with an agreement regarding the provision of retirement benefits to plaintiffs-appellees; and from the prior judgment of the same court, entered on August 7, 2003, granting summary judgment to plaintiffs-appellees on the issue of liability under the agreement.

Affirmed and remanded for clarification and modification of injunctive relief.[1]

_____

WILLIAM A. WERTHEIMER, JR., Special Counsel for Litigation, International Union, UAW (Daniel W. Sherrick, General Counsel, Catherine J. Trafton, Associate General Counsel, Niraj R. Ganatra, Associate General Counsel, *on the brief*), Detroit, MI, *for Plaintiffs-Appellees*.

JOSEPH A. COSTELLO, Morgan, Lewis & Bockius LLP, Philadelphia, PA (Richard D. Bernstein, Sidley Austin Brown & Wood LLP, Washington, D.C., *on the brief*), *for Defendant-Appellant-Cross-Appellee*.

HUGH C. CARLIN, Gross, Shuman, Brizdle & Gilfillan, P.C., Buffalo, NY, *for Third-Party-Defendants-Appellees-Cross-Appellants* Motor Components,

_____

[*] The Honorable Frederick J. Scullin, Jr., Chief Judge of the United States District Court for the Northern District of New York, sitting by designation.

[1] On June 7, 2004, we issued our decision in this case as an unpublished Summary Order. We did so in order to ensure that the parties and the district court had the decision in hand prior to a pending hearing in that court. However, due to the substantial issues involved in the case, we now publish the disposition. Needless to say, while some details have been elaborated upon, the substance of our ruling has not changed.

L.L.C. and BAM Enterprises, Inc.

JOHN W. ALLEN, Varnum Riddering Schmidt & Howlett LLP (Joseph J. Vogan, Anthony R. Comden, *on the brief*), Grand Rapids, MI, *for Third-Party-Defendants-Appellees-Cross-Appellants* Mark IV Industries, Inc., Arvinmeritor, Inc., and Purolator Products Co.

————————————

WESLEY, *Circuit Judge*:

In this appeal, we are called upon to assess a district court's issuance of injunctive relief to a putative class of plaintiffs alleging that they are in imminent danger of suffering irreparable harm. Plaintiffs are all retirees, or surviving spouses of retirees, of Bendix Corporation. They average 83 years of age, and, due to the actions of one of the third-party defendants-appellants, recently suffered a drastic reduction in their level and quality of health care benefits. Plaintiffs contend that defendant-appellant Honeywell International, Inc. – a successor of Bendix – is obligated to remedy this reduction under the terms of an agreement that Bendix entered into in 1976. For the reasons that follow, we hold that the district court correctly ruled that Honeywell is liable under the agreement, and properly issued an injunction ordering Honeywell to comply with that agreement. We remand, however, for the district court to clarify and modify its injunctive relief in two material respects.

**I.      Facts & Procedural Posture**

In 1974, pursuant to a consent order entered by the Federal Trade Commission ("FTC"), Bendix Corporation ("Bendix") made plans to divest itself of three unionized manufacturing

facilities by selling them to the newly created Facet Enterprises, Inc. ("Facet").[2] In its negotiations with the International Union, United Automobile, Aerospace & Agricultural Implement Workers of America ("UAW"), Bendix entered into an agreement entitled a "Guaranty," by which it promised, in essence, that certain retirees, vested employees, and surviving spouses would retain – for life – the level of health benefits in place at Bendix on April 1, 1976. In September 2002, third-party defendant-appellant Motor Components, L.L.C. ("Motor Components") – a successor of Facet – reduced retiree benefit levels below the level in place in 1976. Plaintiffs-appellees James LaForest et al. ("plaintiffs") initially brought a putative class action in the United States District Court for the Eastern District of Michigan, asserting claims against defendant-appellant Honeywell International, Inc. ("Honeywell") – a successor of Bendix – under, *inter alia*, the Labor Management Relations Act ("LMRA") § 301, 29 U.S.C. § 185. Plaintiffs sought to hold Honeywell to the terms of the Guaranty.

In May 2003, the case was transferred to the United States District Court for the Western District of New York, pursuant to 28 U.S.C. § 1404(a). In August 2003, the district court granted summary judgment to plaintiffs on the issue of liability, holding that the Guaranty unambiguously obligated Honeywell to provide for the level of health benefits available in 1976, given the triggering fact that Motor Components reduced benefits below that threshold. See LaForest v. Honeywell Int'l, Inc., No. 03-CV-6248T, 2003 WL 22103474 (W.D.N.Y. Aug. 7, 2003) ("LaForest I"). Subsequently, in September 2003, the district court issued a preliminary injunction ordering Honeywell to comply with the Guaranty, see LaForest v. Honeywell Int'l,

---

[2] One of these facilities was located in Elmira, New York, and two were located in Michigan.

_Inc._, No. 03-CV-6248T, 2003 WL 23180220 (W.D.N.Y. Sept. 19, 2003) ("_LaForest II_"), and, in November 2003, the court issued an unreported decision in which it clarified the terms of that injunction. More recently, in March 2004, the district court certified the plaintiff class. Honeywell and third-party defendants-appellants (collectively "defendants") appeal the district court's September 2003 issuance of the preliminary injunction ordering Honeywell to honor the Guaranty, as well as the court's August 2003 grant of summary judgment to plaintiffs.

**II.    Discussion**

At the outset, we are presented with a jurisdictional question. This Court has jurisdiction to hear the appeal of the district court's September 2003 issuance of the preliminary injunction under 28 U.S.C. § 1292(a)(1). Although the August 2003 judgment is not a final order, "where an issue is 'inextricably intertwined' with a question that is the proper subject of an immediate appeal, or . . . where review of a jurisdictionally insufficient issue is 'necessary to ensure meaningful review' of a jurisdictionally sufficient one, an appellate court may exercise pendent jurisdiction." _Rein v. Socialist People's Libyan Arab Jamahiriya_, 162 F.3d 748, 757-58 (2d Cir. 1998) (quoting _Swint v. Chambers County Comm'n_, 514 U.S. 35, 51 (1995)). Thus, since the issuance of the preliminary injunction was premised in part on the grant of summary judgment, we assert pendent jurisdiction over the latter. And for the reasons that follow, we affirm the district court's grant of summary judgment and issuance of the preliminary injunction, but remand for clarification and modification of that injunction.

A.    The District Court's Grant of Summary Judgment

Defendants challenge the district court's grant of summary judgment on several grounds. First, defendants note that under the terms of the Guaranty, Honeywell's obligation to provide for

5

the maintenance of benefit levels may be "reduced in an amount equal to the reduction, if any, in the insurance coverage . . . below that provided for in the Insurance Agreement as of [April 1, 1976], *pursuant to any agreement between Facet and the Union.*" Defendants argue that the UAW "tacitly" agreed to Motor Components' reduction of benefit levels insofar as it did not "vigorously" contest that reduction – and therefore that Honeywell is not liable to provide for benefit levels above those resulting from this "agreement."

The record is to the contrary. In April 2002, Motor Components informed UAW representative Scott Montani that it could no longer afford to pay benefits at then-current rates. Montani responded by explaining that the UAW would "fight" any reduction in benefits. In July 2002, Motor Components announced that it would be reducing benefits. In an e-mail, Montani explained, *inter alia*, that "[t]he UAW does not cease to represent our retirees! That is our heritage." In an August 2002 letter to the retirees, Montani assured them that "[t]he Union is on the verge of taking action, if appropriate, on your behalf." While this conduct is squarely in accordance with the UAW's history of resisting benefit reductions, defendants claim that subsequent conduct was to the contrary.

During Motor Components' negotiations with the UAW over their 2002 collective bargaining agreement, Motor Components reiterated its position that it could no longer afford then-current levels of benefits, and proposed discontinuing them. The UAW then filed suit against Honeywell, seeking to hold it to the Guaranty. Motor Components and the UAW continued to negotiate regarding then-current employees, but ceased negotiations over retiree benefits. Defendants argue that this course of conduct raises a genuine issue as to whether the UAW "acquiesced" in the benefit reduction sufficient to permit the conclusion that it had an

"agreement" with Motor Components that the latter could reduce retiree benefits.

The district court found this argument to be without merit because the Guaranty does not purport to place an affirmative obligation on the UAW to "vigorously" challenge benefit reductions. LaForest I, 2003 WL 22103474, at *5. The court further noted that "the UAW had little motivation to do so when the full payment of those benefits had been ensured by the Guaranty, and where the UAW knew that the proposed change could not be properly effected absent its consent." Id. Defendants attempt to turn this reasoning on its head, suggesting that because the UAW believed it could maintain benefit levels by pursuing Honeywell, it had every reason simply to acquiesce in reductions and then file suit on the Guaranty. This argument makes little sense.

The UAW knew that any agreement between it and Motor Components would *preclude* recovery against Honeywell. The very act of filing suit against Honeywell, then, indicates that the UAW believed it had a viable action, *i.e.* that it had *not* made an agreement with Motor Components to reduce benefits. In more basic terms, even if defendants could persuade this Court that Motor Components made an "offer" to the UAW regarding the reduction of benefits, the UAW's conduct – both in its initial reactions to Motor Components and in its filing suit against Honeywell – is clearly inconsistent with the suggestion that it "accepted" that offer. Thus, we agree with the district court that there is no genuine issue of material fact as to whether the UAW agreed to Motor Components' September 2002 benefit reduction. It did not.

Defendants also challenge the district court's grant of summary judgment on the grounds that (1) a "guaranty" is a secondary obligation which requires a showing that the primary obligor defaulted before liability will attach, and no such showing was made here; (2) the Guaranty fails

7

on the ground that it is "illegal," specifically, that it contravenes the FTC's directive that Bendix not guaranty any obligations of Facet; (3) the Guaranty fails for lack of consideration; and (4) the Guaranty is unenforceable because plaintiffs cannot demonstrate with "reasonable certainty" the amount for which Honeywell is putatively liable under its terms.

The agreement into which Bendix entered in 1976 reads in relevant part:

> Bendix will pay, or cause to be paid, on behalf of each Protected Person . . ., an insurance premium to provide . . . insurance coverage equal to the excess, if any, of:
>
> (i) insurance coverage such Protected Person is eligible to receive, or would have become eligible to receive, pursuant to the provisions of the Insurance Agreement in effect on [April 1, 1976] . . .; over
>
> (ii) any insurance coverage provided by the payment of premiums by Facet on behalf of such Protected Person.

Defendants' first and second arguments fail for the simple reason that the Guaranty is not a "guaranty." It does not create a secondary obligation to provide benefits if and only if Facet's successors breach a contractual obligation to do so. Cf. Weissman v. Sinorm Deli, Inc., 88 N.Y.2d 437, 446 (1996). Rather, Honeywell is under a clear contractual obligation to provide for the maintenance of benefit levels if and only if a successor of Facet at some point permits those benefits to fall below the guaranteed level. Once that triggering event occurs, regardless of the cause of that event, Honeywell becomes liable.

The district court recognized that "the Guaranty neither creates nor alludes to any promise by Facet to provide Bendix retirees with any particular level of insurance coverage." LaForest I, 2003 WL 22103474, at *4. Further, the court explained that "[e]ven if such a promise had been made by a separate agreement between Facet and Bendix, or between Facet and the UAW or

8

retirees, Honeywell fails to demonstrate how that agreement could take precedence over the Guaranty and create a 'hierarchy of obligors,' something which the Guaranty does not contemplate." Id. As evidence of the fact that the Guaranty does not create a "hierarchy of obligors," the district court quoted a May 1976 letter sent to employees potentially covered by the Guaranty, which stated that "certain pension benefits and payment of certain insurance premiums are guaranteed by Bendix for life . . . . In the case of insurance, Bendix will make up any difference in insurance premiums necessary to provide coverage." Id. at *5. Indeed, as the district court reasoned:

> Bendix did not condition its promise upon the failure of its retirees to obtain relief from Facet or any of its successors: it simply promised to "make up any difference in insurance premiums necessary to provide coverage" to those employees willing to remain in the employ of an enterprise that was embarking on a risky new venture. As those employees weathered the company's transition from Bendix to Facet, that letter described, and in fact embodied, a covenant between them and Bendix, assuring them that their benefits would always be covered by the protective umbrella of the parent corporation. It was Bendix's promise to employees – not Facet's. Facet was not a party to that compact then, and therefore, Facet's successor cannot be said to have undertaken obligations as a primary obligor under the Guaranty now.

Id. Thus, the district court took the view that the Guaranty constituted a contract between Bendix (and its successors) and those covered by the Guaranty. The plain language of the Guaranty and the explanatory letter sent to prospective retirees support such a view.

Thus, we agree that Honeywell's obligation under the 1976 agreement arises not by operation of a guaranty, but rather out of an ordinary contractual promise. The Guaranty may have been loosely titled as such, but it would appear that the parties to it intended the more common understanding, "guarantee," *i.e.* they intended that Bendix "guarantee" that benefit levels would remain stable – not that it "guaranty" the obligation of Facet. Therefore, we reject

9

the argument that Honeywell's liability can be established only on a showing of a "default" by Motor Components. Similarly, although it is true that the FTC consent order prohibited Bendix from guarantying the obligations of Facet, this agreement does not violate that prohibition.[3]

Defendants' third argument is belied by the record. Plaintiffs assert, and the district court found, that Bendix entered into the Guaranty in order to forestall the early retirement of employees wary of joining the newly formed Facet. See LaForest I, 2003 WL 22103474, at *1. Defendants note that no retiree has testified that, but for the Guaranty, he or she would have retired early. But such evidence is not necessary to demonstrate consideration. Rather, the record reveals that a UAW bargainer expressed the early-retirement concern to Bendix during bargaining; that the UAW commented on the concern to the FTC; that a summary of the 1976 tentative divestiture agreement between the UAW and Bendix suggests that the Guaranty was entered into in exchange for, among other things, the UAW agreeing to the spin-off of Facet; and that a Bendix official involved in the negotiation of the Guaranty considered it to have been entered into in exchange for the UAW executing a spin-off "enabling agreement." Thus, the record supports the conclusion that the Guaranty was supported by consideration.

Finally, defendants suggest that the Guaranty is unenforceable because plaintiffs cannot

---

[3] For the same reasons, the district court did not err in holding that plaintiffs are not obligated to "exhaust their remedies" against the third-party defendants before pursuing Honeywell. See LaForest I, 2003 WL 22103474, at *4. That argument rests on the premise that the Guaranty was a "guaranty of collection" as opposed to a "guaranty of payment." As discussed above, this Guaranty does not, however, appear to be a guaranty at all. But even if it were, the district court found that, as it contained no language purporting to limit or condition the obligation contained therein, it was a guaranty of payment, for which a plaintiff need not seek redress against the primary obligor. Id. Defendants' only response to this is to assert that the Guaranty is "filled with 'limitations.'" In fact, the Guaranty does not condition liability on anyone first pursuing Facet or its successors.

prove with "reasonable certainty" the amount for which Honeywell is liable. While we disagree that the "amount due" is unascertainable, we do find, as discussed *infra*, that the district court has a bit of work to do in this regard. Nevertheless, we hold that the district court did not err in granting summary judgment to plaintiffs on the issue of Honeywell's liability under the Guaranty.

B. The District Court's Issuance of the Preliminary Injunction

The district court correctly stated that "[i]n this Circuit, to obtain a preliminary injunction the requesting party must demonstrate: (1) irreparable harm; and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits of the case to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting preliminary relief." LaForest II, 2003 WL 23180220, at *1 (citing Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir.1979)). Given that the district court did not err in granting summary judgment on the issue of Honeywell's liability under the Guaranty, it also did not err in concluding that plaintiffs demonstrated a likelihood of success on the merits.

Primarily at issue, then, is whether plaintiffs adequately demonstrated irreparable harm. Additionally, defendants raise concerns regarding whether plaintiffs engaged in undue delay in seeking the injunction, whether the injunction was overbroad as to whom and what it covers, whether it was sufficiently specific, and whether the district court erred in waiving the requirement of a bond. This Court reviews the granting of a preliminary injunction for abuse of discretion. New York Magazine v. Metro. Transport. Auth., 136 F.3d 123, 126 (2d Cir. 1998). For the reasons that follow, we hold that the district court did not abuse its discretion in issuing the preliminary injunction, but we remand for clarification and modification of that injunction as

11

to the issues of who and what are covered by the Guaranty.

1.    *Whether Plaintiffs Suffered Irreparable Harm*

The district court held that plaintiffs had demonstrated irreparable harm by showing that, absent an injunction ordering Honeywell to provide premiums sufficient to secure guaranteed levels of benefits, "the reductions in medical coverage will cause: (1) substantial risk to plaintiffs' health; (2) severe financial hardship; (3) the inability to purchase life's necessities; and (4) anxiety associated with uncertainty." LaForest II, 2003 WL 23180220, at *1. Indeed, if substantiated by the evidence, the district court's holding comports with this Court's understanding of irreparable harm as "harm shown to be non-compensable in terms of money damages." Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd., 339 F.3d 101, 113-14 (2d Cir. 2003).

In concluding that plaintiffs demonstrated irreparable harm, the court relied on this Court's holdings in Whelan v. Colgan, 602 F.2d 1060 (2d Cir. 1979), and Communications Workers of America, Dist. One, AFL-CIO v. NYNEX Corp., 898 F.2d 887 (2d Cir. 1990), that the termination of medical benefits will ground a claim of irreparable harm. The court also relied on United Steelworkers of America v. Textron, Inc., 836 F.2d 6 (1st Cir. 1987), an opinion written by Justice Breyer while still on the First Circuit.

In Whelan, this Court affirmed the granting of a preliminary injunction ordering the defendant to continue providing medical benefits to striking workers. In doing so, it stated that "the threatened termination of benefits such as medical coverage for workers and their families obviously raised the spectre of irreparable injury." Whelan, 602 F.2d at 1062. And in NYNEX, the defendant informed its employees that it intended to terminate medical benefits, but also

12

informed them that they were eligible for replacement benefits under the Consolidated Omnibus Budget Reconciliation Act of 1985, 29 U.S.C. §§ 1161-68 ("COBRA"). Nevertheless, because the defendant then frustrated the employees' efforts to receive COBRA benefits, the Court treated the defendant's conduct as, effectively, a threatened termination of benefits. Citing Whelan, the Court affirmed the district court's grant of a preliminary injunction ordering the defendant to facilitate COBRA benefits. NYNEX, 898 F.2d at 891-92.

In Textron, the defendant ceased paying medical insurance premiums for retired former employees, in circumstances somewhat analogous to the present case. In affirming the district court's grant of a preliminary injunction ordering the defendant to resume payment of premiums, the court considered:

> general facts that either are commonly believed or which courts have specifically held sufficient to show irreparable harm; such general facts as (1) most retired union members are not rich, (2) most live on fixed incomes, (3) many will get sick and need medical care, (4) medical care is expensive, (5) medical insurance is, therefore, a necessity, and (6) some retired workers may find it difficult to obtain medical insurance on their own while others can pay for it only out of money that they need for other necessities of life.

Textron, 836 F.2d at 8 (citing, *inter alia*, Whelan). The Court then explained that it was accepting as proof of the actual existence of these "general facts" a single affidavit of a union official stating that three of the retirees had actually suffered a reduction in medical care as a result of the termination of benefits. Id.

After considering these authorities, the district court turned to plaintiffs' evidence. It noted that "plaintiffs provided affidavits of six people entitled to benefits under the Bendix Guaranty. Each undoubtedly demonstrates that they will suffer much more than monetary harm." LaForest II, 2003 WL 23180220, at *2. On this basis, the district court held that plaintiffs

13

sufficiently demonstrated that Honeywell's refusal to pay the shortfall in premiums needed to restore benefits to the guaranteed level caused irreparable harm to the putative class.

Defendants contest the district court's conclusion by noting, first, that in the cases on which the district court relied, plaintiffs suffered the threat of termination, or the actual termination, of their medical benefits – whereas here plaintiffs suffered a reduction in benefits (or increased costs of maintaining benefit levels). Defendants argue that approximately ninety percent of the putative class is eligible for Medicare, and thus is able to secure alternative coverage, and that every member of the class was given the opportunity to participate in an alternative prescription drug program. However, it is not clear that this difference is dispositive. So long as plaintiffs demonstrated injury "non-compensable in terms of money damages," Wisdom Import Sales, 339 F.3d at 113-14, they have demonstrated irreparable injury.

The district court found that plaintiffs demonstrated more than mere monetary harm, and the record supports this finding. Most significantly, rather than the prescription drug program with no deductibles, no maximum, and a $3 co-pay for non-generic drugs that plaintiffs previously enjoyed, the alternative plan provided by Motor Components imposes a $100 per year deductible, a $3000 annual maximum, and $15/40/60 co-pays for generic, preferred name-brand, and non-preferred name-brand prescriptions. Plaintiffs provided individualized evidence of the impact of these changes on the retirees, including an imminent threat that they would have to forego needed prescriptions. In addition, plaintiffs note that the approximately ten percent of the class that is ineligible for Medicare received a replacement stipend of only $125 per month from Motor Components, and presented evidence that this amount was seriously inadequate for their needs. We hold that the district court did not abuse its discretion in relying on this evidence in

14

concluding that the then-putative class suffered irreparable harm warranting a preliminary injunction.[4]

Our conclusion is not affected by defendants' attack on the evidence on which the district court relied. Defendants note that the district court granted relief on the basis of affidavits submitted by persons who were not named plaintiffs, and, moreover, that the court relied on only six affidavits in a case involving nearly six hundred putative class members. The procedural posture of this case is relevant in this regard. The district court first properly granted summary judgment to plaintiffs on the issue of liability, and then issued a preliminary injunction ordering relief for the putative class. But before reaching this Court, the putative class became a certified class. That the six affidavits relied upon by the district court were submitted by unnamed plaintiffs gives us little pause, given that these persons are now members of the certified class.

Regarding the adequacy of the six affidavits, defendants urge this Court to adopt the evidentiary standard set forth in Adams v. Freedom Forge Corp., 204 F.3d 475 (3d Cir. 2000), and assert that Adams requires a more exacting level of proof to support injunctive relief in a case such as this. The facts of Adams are analogous to the present case insofar as, in each, the

---

[4] Defendants also argue that "plaintiffs' six month delay in seeking a preliminary injunction weighs against a finding of irreparable harm," noting that although Motor Components informed plaintiffs that the benefit reduction would take effect in September 2002, plaintiffs did not move for a preliminary injunction until February 2003. Plaintiffs respond that (1) they brought their initial action for declaratory judgment, and moved for an expedited hearing, before September 2002; (2) they moved for summary judgment in October 2002; and (3) they sought a preliminary injunction at the end of discovery in February 2003. After the case was then transferred from Michigan to New York, plaintiffs (1) sought expedited oral argument on their motions for summary judgment and preliminary injunction, and (2) renewed their motion for preliminary injunction one month after winning summary judgment on the issue of liability. Given plaintiffs' demonstrated requests for speedy procedure, we hold that any "delay" was insufficient to undermine a finding of irreparable harm.

dispute is over the increased cost of medical benefits. There, 136 retirees (and surviving spouses) brought suit to enjoin the defendant from altering the health care benefits it had been providing them since they retired. Adams, 204 F.3d at 479. The proposed modifications to the plaintiffs' benefits included a shift from a no-premium plan to one in which the retirees could choose between plans, all of which provided substantially similar coverage as the original plan – but also required the retirees to pay monthly premiums. Id. at 480. The district court granted the plaintiffs a preliminary injunction, precluding the defendant from instituting the changes. On appeal, the Third Circuit reversed in part. The court first noted that only 11 of the 136 plaintiffs testified as to the effect the changes would have. Id. at 481. It then found that only three of *these* plaintiffs provided testimony sufficient to demonstrate irreparable harm, as opposed to mere monetary harm, id. at 483-84, and that only two of these plaintiffs had demonstrated a likelihood of success on the merits, id. at 494. The court thus reversed the district court's grant of a preliminary injunction for all but two of the plaintiffs.

In severely trimming the scope of the injunction, the Adams court criticized then-Judge Breyer's reliance in Textron on "general facts" and "common sense," regarding the sort of harm suffered by retirees whose health benefits are terminated, as an insufficient foundation on which to conclude that individuals had suffered irreparable injury. See Adams, 204 F.3d at 485-87. The Adams court asserted that "[t]he law does not take judicial notice of matters of 'common sense,' and common sense is no substitute for evidence." Id. at 487. The court thus articulated a standard by which the plaintiffs must present individualized proof of irreparable harm.

Notably, the Adams court recognized that its standard could be met in a representative fashion (as in a class action), and explained that "so long as the plaintiffs lay an adequate

16

foundation from which one could draw inferences that the testifying plaintiffs are similarly situated – in terms of irreparable harm – to all the other plaintiffs," a court could permissibly engage in inductive reasoning to reach the conclusion that *every* plaintiff suffered the threat of irreparable harm. Id. Because the plaintiffs in that case did not lay such a foundation, the court held that they presented insufficient evidence to justify a preliminary injunction protecting *all* of the plaintiffs. Id. at 488.[5] See also Cooper v. TWA Airlines, LLC, 274 F. Supp. 2d 231, 242 (E.D.N.Y. 2003) (denying class-wide injunctive relief in the absence of, among other things, some indication that individuals suffering irreparable harm were representative of the class).

In urging this Court to adopt the standard set forth in Adams, defendants suggest that the district court's citation to Textron indicates that it relied heavily on the "general facts" noted by Justice Breyer. However, the district court explicitly relied on the affidavits of six persons covered by the Guaranty, each of whom alleged circumstances amounting to irreparable injury. As Adams concedes, plaintiffs should be allowed to adduce evidence of harm representatively, so long as they lay a foundation that the representative plaintiffs are similarly situated with regard to the issue of irreparable harm.[6] Adams, 204 F.3d at 487.

Determining whether plaintiffs have laid such a foundation is a case-sensitive inquiry

_____

[5] It should be noted that the court in Adams otherwise provided latitude in the method of providing individualized evidence. It explained that the plaintiffs could do so through "[s]imple affidavits," and that it would likely often be the case that defendants would have difficulty explaining how their conduct would have different effects on different plaintiffs. See Adams, 204 F.3d at 489. What is somewhat unclear from this explanation is how the Adams court perceived the burden of proof, given its suggestion that it would be the defendant's responsibility to differentiate plaintiff harm.

[6] Being sufficiently similarly situated to justify class certification, while relevant in this regard, need not be determinative.

17

subject to review for abuse of discretion. As such, under Adams the question in the present case would be whether the district court abused its discretion in finding that plaintiffs provided a sufficient foundation that the six affidavits on which the district court relied are representative of the class. On that issue, it is worth noting that every member of the class was either an employee of the same firm or is a surviving spouse of such an employee, and defendants do not contest the fact that the *average* age of the approximately 600 retirees at issue is 83 years old. Were we to adopt Adams – and we do not do so now, thereby leaving open whether, in this Circuit, Textron, Adams, or something in between is the governing approach – we would conclude that the district court did not abuse its discretion in inferring from the evidence presented that irreparable harm was class-wide.[7] Cf. Golden v. Kelsey-Hayes Co., 73 F.3d 648 (6th Cir. 1996).

### 2. *Whether the Injunction is Overbroad*

Defendants argue that, even if the district court was within its discretion to grant the preliminary injunction, the terms of that injunction sweep too broadly. They argue that the injunction orders Honeywell to provide a different level of coverage than is stipulated in the Guaranty, and that this court-ordered coverage extends to too many people. On both matters, the issue revolves around difficulties of proof. And on both, we remand and ask the district court to clarify and modify its order.

The Guaranty obligates Honeywell to provide for insurance coverage equal to that which would have been available as of April 1, 1976.[8] It further provides that this coverage shall

---

[7] While it is possible that class members will suffer varying degrees of harm, such is the nature of induction. It does not produce certainty; it produces probability.

[8] The Guaranty also provides that Bendix's obligation can be altered only by reductions in the level of coverage effected by an agreement between Facet (or its successors) and the UAW.

extend to a limited class of persons: (1) those who retired prior to divestiture, (2) those with at least ten years of service prior to divestiture, and (3) surviving spouses of the first two groups. In its September 2003 order granting the preliminary injunction, the district court specifically ordered that:

> Defendant Honeywell International shall provide or cause to be provided . . . the health insurance benefits and prescription drug program in place on August 31, 2002, as outlined in the "1999 Purolator Products Company Medical Plan for Certain Hourly Retirees formerly Employed by the Bendix Corporation" for each individual listed as a "Bendix Retiree" in the March 2002 Mark IV/BAM purchase agreement.

LaForest II, 2003 WL 23180220, at *3.

On the issue of whether the district court ordered an incorrect level of coverage, defendants note the facial disparity between the Guaranty's stipulation of 1976-level coverage and the injunction's stipulation of 2002-level coverage. Plaintiffs concede that the Guaranty stipulates coverage equivalent to that provided as of April 1976. The Guaranty expressly states that the guaranteed level of benefits is "that provided for in the Insurance Agreement" entered into in 1974 – an agreement still in effect in April 1976. The Insurance Agreement, in turn, explains that "[t]he scope and level of benefits shall be those outlined in the Bendix Corporation Hourly Segment Benefit Manual under the National Account Program as of August 1, 1974, for all employees as developed by the Indiana Blue Cross-Blue Shield plan." Neither party has been able to locate the Benefit Manual or the National Account Program referenced in the Insurance Agreement.

---

The UAW and Purolator Products Co. ("Purolator"), another successor of Facet, agreed to a limited reduction in 1995; that reduction is thus incorporated into the obligation imposed by the Guaranty.

In lieu of this missing evidence, plaintiffs provided the district court with affidavits from eleven covered retirees, each explaining that his or her benefit levels had remained unmodified over the years. Plaintiffs also presented to the court a 1999 plan under which Purolator, a successor of Facet, provided benefits to the retirees in question – a plan expressly limited to persons covered by the Guaranty. Finally, plaintiffs provided the district court with a copy of the Summary Plan Description in place in 1980 (under Facet's watch), permitting the court to compare the level of benefits in 1999 to the level in 1980. After reviewing this evidence, the court determined that the level of benefits provided as of April 1, 1976 was equivalent to the level provided in the 1999 Purolator plan, which was the plan in place in 2002. Defendants do little to rebut this evidence, other than suggest that four of the eleven affidavits mentioned above suffer from defects, including the fact that two of the affiants retired after 1976 and admittedly suffer from memory loss. Nevertheless, because of the facial disparity between the Guaranty and the district court's injunction, we remand this case to the district court to modify the injunction such that it accurately reflects that the guaranteed level of benefits is the level in place on April 1, 1976.

In this regard, the district court may wish to engage in further fact-finding as to the 1976 level of benefits. We note that it is not implausible that the 1976 benefit level will comport with the 1999 Purolator plan. Indeed, that there is evidence that they had equivalent cost-sharing mechanisms is highly persuasive. We also find defendants' suggestion that plaintiffs are not entitled to coverage for particular prescriptions or medical advances that did not exist in 1976 to be a strained reading of the Guaranty. The inquiry into the level of benefits to which plaintiffs are entitled surely has a more general answer; if "full prescription" coverage was available in

20

1976, then "full prescription" coverage is the level to which plaintiffs are entitled today.

On the issue of whether the district court ordered coverage for too many people, defendants take issue with the court's use of the "Bendix Retiree" list in the "March 2002 Mark IV/BAM purchase agreement."[9] Defendants contend that there has been no showing that the Bendix Retiree list coincides with the categories of persons specifically covered by the Guaranty. Indeed, defendants claim that preliminary investigation reveals that a number of persons on the list are definitely *not* covered by the Guaranty. According to defendants, these persons include those who have died, voluntarily opted-out of coverage, been deemed "ineligible" under the Guaranty, and received lump-sum pension benefits. Plaintiffs do not contest that some persons on the list are not eligible for benefits under the Guaranty. Indeed, plaintiffs suggest that they "remain open to working with Honeywell and Motor Components to resolve any legitimate eligibility issues." Thus, although we affirm the issuance of the preliminary injunction, we remand so that the district court may make findings of fact as to who is legitimately due the protections of the Guaranty – and modify the injunctive relief accordingly.

3.    *Remaining Issues*

Contrary to defendant's suggestion, the district court's injunction does not fail for lack of specificity. Although it is true that "fairness requires that the litigants receive explicit notice of precisely what conduct is" required, Lau v. Meddaugh, 229 F.3d 121, 123 (2d Cir. 2000) (per

---

[9] In 1994, Mark IV Industries, Inc. ("Mark IV") acquired Purolator. Mark IV subsequently administered the Purolator health plan designed exclusively for retirees covered by the Guaranty. Between February 1999 and March 2002, Mark IV divided Purolator into three business groups. In March 2002, Mark IV sold one of those groups, Motor Components, to BAM Enterprises, Inc. Attached to the purchase order was a list of approximately 600 Bendix retirees and surviving spouses.

curiam) (finding error in a district court's failure to memorialize an injunction in writing), fairness does not require a district court to resolve every possible inquiry or contingency that an injunction might raise. Honeywell received notice of what it was to do, what standard would guide its conduct, and the time frame in which to do it. On remand, the district court will clarify and modify its order as to who and what is covered by the Guaranty, but it need not specify any more precisely than it already has the mechanism by which Honeywell is to comply.

Further, the district court did not err in foregoing the requirement of a bond. Given that the court correctly granted summary judgment to plaintiffs on the issue of liability, it is undisputed that Honeywell is under a legal obligation to honor the Guaranty. Complying with this obligation cannot constitute "harm" to Honeywell, much less the sort of harm that would require the protective measure of a bond. See Doctor's Assocs., Inc. v. Stuart, 85 F.3d 975, 985 (2d Cir. 1996). Therefore, because the district court did not err in granting summary judgment to plaintiffs, and because the court did not abuse its discretion in granting a preliminary injunction ordering Honeywell to comply with the Guaranty, we affirm both judgments – but remand for clarification and modification of the injunctive relief with respect to who and what is covered by that relief.

**III.    Conclusion**

For the reasons set forth above, the judgments of the District Court are hereby AFFIRMED, but the case REMANDED for clarification and modification of the preliminary injunction.